THE PEOPLE *ex rel.* E. R. BUDD *v.* WILLIAM HOLDEN.

ACT FOR CONTESTING ELECTIONS.—The Act conferring upon any elector the right to contest the election of any person who has been declared duly elected to a public office, does not deprive the people in their sovereign capacity, on complaint made, to inquire into the authority by which any person assumes to exercise the functions of a public office or franchise.

JURISDICTION OF DISTRICT COURT IN ELECTION CASES.—The District Court has jurisdiction in an action brought by the Attorney-General, either upon his own suggestion or upon the complaint of a private party, to inquire into the authority by which any person assumes to exercise the functions of a public office or franchise, and to remove him therefrom if it be made to appear that he is a usurper having no legal title thereto.

RECORD IN ACTION FOR USURPING AN OFFICE.—In an action brought in the District Court to try the right to an office, if the record shows in any manner that all the election returns were given in evidence, the judgment will not be reversed by the appellate Court even though there is no formal statement in the record that such returns were all in evidence.

BALLOTS RETURNED TO COUNTY CLERK AS EVIDENCE.—In an action brought in the District Court to try the right to an office, the list of ballots cast in any precinct, and returned with the poll list and tally paper to the County Clerk, is better evidence of the number of votes cast at the precinct, and for whom cast, than the tally list made from them by the officers of the election.

SAME.—The presumption of law is that the ballots are all returned to the County Clerk, and that they have not been mutilated, and if such is not the case, it should be shown by evidence.

SAME PERSON VOTING TWICE.—If the same elector votes twice at the same election, his second vote should be excluded in the count.

WHERE AN ELECTOR SHOULD VOTE.—When an elector moves his family to a county with the intention of residing there, that is the county where he should vote while his family remains there, although he passes his time and works in an adjoining county.

THIRTY DAYS RESIDENCE IN A COUNTY.—The thirty days residence in a county to entitle an elector to vote must be ascertained by excluding the day of the election.

WHAT CONSTITUTES A BALLOT.—A ballot is a single piece of paper containing the names of the candidates and the offices for which they are designated.

BALLOT CONTAINING SAME NAME TWO OR MORE TIMES.—If a ballot contains the name of a person voted for, and the office for which he is designated, two or more times, it is not for that reason to be rejected, but should be counted as one vote for the person named.

SAME.—A ballot having written or printed on it the name of a person voted for, and his office, two or more times, does not constitute two or more tickets folded together.

RESIDENCE WHILE IN THE SERVICE OF THE UNITED STATES.—The clause in the Constitution of this State, which declares that " no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States," does not prevent a person who removes to a county while in the service of the United States, from acquiring a residence in that county while in the said service, if it is his intention so to do.

STIPULATION IN AN ACTION.—If a stipulation entered into by the respective attorneys in an action is in subsequent proceedings virtually disregarded by both parties, the Court will not, after it has been thus disregarded, enforce it.

SAME.—*Query?* Is a stipulation, made by the relator or his private attorney with the defendant in an action brought by the Attorney-General in the name of The People against a person for unlawfully usurping an office and to remove him therefrom, binding upon the people ?

CONTINUANCE ON GROUND OF SURPRISE.—If a party is taken by surprise by an extension of time to take testimony before a referee, and by the testimony thereby introduced, he should apply for a continuance for that reason in order to procure further evidence on his side, or he cannot have the benefit of the point in the appellate Court.

COSTS OF PRINTING TRANSCRIPT.—If the printed transcript in the Supreme Court is unnecessarily long, the party responsible for this will be adjudged to pay the cost of printing thus unnecessarily incurred.

APPEAL from the District Court, Seventh Judicial District, Mendocino County.

The relator and defendant were both voted for for the office of County Judge of Mendocino County, at the judicial election held in the fall of 1863. The defendant was declared elected

by the Board of Canvassers, and was thereafter duly commissioned by the Governor. After the defendant had entered upon the discharge of the duties of the office, the Attorney-General brought an action in the District Court, in the name of The People, upon the information of the relator against the defendant, charging him with having intruded into, usurped, and unlawfully exercised the office of County Judge of Mendocino County. The action was brought under the provisions of the Fifth Chapter of the Civil Practice Act. The complaint alleged that the relator received the largest number of legal votes, and the Court is asked to adjudge the defendant an usurper, and the relator entitled to the office.

An order was made by the Court on the 21st of March, 1864, by consent of parties, appointing James L. Broaddus a referee to take and report the evidence. The order further provided that plaintiff should close his testimony in forty days, and defendant should have forty days thereafter to close his testimony, and that each party should have fifteen days thereafter to take rebutting testimony. June 13th, on application of relator, another order was made that plaintiff have five days further time after June 24th, to take testimony.

June 23d, the attorneys for relator and defendant stipulated that plaintiff might take the testimony of S. M. Smith at any time before the 12th day of July.

On the 7th day of July the following stipulation was entered into :

William H. McGrew, attorney for the relator in the above entitled cause, and Thomas B. Bond, attorney for defendant therein, hereby stipulate and agree that the said cause may be tried at the next term of the District Court of Mendocino County, on the evidence already adduced before the referee, James L. Broaddus, subject to all legal objections, and that neither party will attempt to obtain or offer to produce on the trial any other evidence except that which is expressly herein stated, namely : the plaintiff shall have the right to take before the referee the deposition of Stephen M. Smith, and the defendant the right to take rebutting evidence of not more

than one witness to that of said Stephen M. Smith, and also not more than one witness in rebuttal to Charley Shanbargen's deposition taken before said referee, and also that defendant be allowed to offer in evidence a certificate of the Adjutant-General, subject to like objections.

July 9th, an order was made, on application of relator, granting him five days from July 11th to take Smith's testimony.

July 8th, defendant's attorney served a notice that on the 18th of July he would move the Court for leave to file an amended answer. On the 18th of July the Court granted leave, and an amended answer was filed. The Court then, on application of plaintiff, continued the cause for the term, on the ground that plaintiff was taken by surprise in consequence of the amended answer.

The District Court rendered judgment excluding defendant from the office of County Judge, and awarding the same to the relator. The defendant appealed.

*Bennett, Cook & Clarke,* for Appellant.

It is insisted that the course provided by the election laws for a contest is merely cumulative to the rights to contest by information, in the nature of a *quo warranto.*

This we deny, for the reasons:

1. That both remedies are created by statute.

2. The right to hold the office, the manner in which it can be obtained, etc., is regulated wholly by the statute, which fixes and prescribes the mode of its exercise; which same statute provides, in case of contest, the mode and manner in which such contest shall be settled; consequently, the statute must be followed both in the election and contest.

3. Information in the nature of a *quo warranto* was intended to reach an entire different class of officers and persons; persons, for instance, appointed by the Governor, by the Board of Pilot Commissioners, or any other appointing power.

Stipulations have invariably been held binding by the Courts of this State. (*Kalkman* v. *Bayliss,* 23 Cal. 305; *Doe* on

demise of *Wetherell* v. *Bird*, 7 Carr. & Payne; 32 English Common Law Reports, 415, 416; 2 New Hampshire, 521; *Elton* v. *Larkin*, 5 Carr. & Payne; 24 English Com. Law Rep. 372; *Beck* v. *Lamot*, 13 Howard Pr. Rep. 27; *Malin* v. *Riney*, Cain's Rep. 117.)

We insist that Courts cannot set aside or disregard a stipulation of this kind, except after notice of motion for that purpose, and a showing that it was entered into by mistake or in ignorance of material circumstances; or, in other words, for the same causes that a Court of equity will set aside any other agreement. (See, as to stipulation, 5 Abbott's Digest, under title " Stipulations.")

*George Cadwalader*, for Respondent.

The proceeding to contest an election is given to an elector, but an information in the nature of *quo warranto* is a prerogative writ, filed at the instance of the Attorney-General, and designed to protect the State against the exercise of its offices by unlawful tenants. There is no similarity in the proceedings, and the question has always been, not whether the District Court had jurisdiction, but whether the County Court had—the jurisdiction of the latter being supported alone on the theory that the proceeding provided for by the statute was special. (*Saunders* v. *Haynes*, 13 Cal. 152.)

The stipulation of July 7th is a very curious one—and more curious still in a suit brought by the State against the unlawful tenant of an office. In the introduction of evidence in a State case *quasi criminal*, the State, as well as the Court, from high motives of public policy, have some rights which are entitled to respect, and in this particular the rule is different from that of an ordinary civil case, where the parties are at perfect liberty to barter away their rights. Thus, in the election contest of *Searcy* v. *Grow*, 15 Cal. 119, a judgment of ouster was rendered by default, of which Mr. Chief Justice Field observed that: " In this respect the ruling of the Court was clearly erroneous. The public is interested in a contest of this character; it is not a matter solely between the par-

ties to the record, and the popular will is not to be set aside upon a mere failure of a party to respond to charges alleged against his right by an individual elector."

And so in this case, we can say that the State had an interest in having the office in dispute awarded to the person who was fairly elected thereto. Suppose, in a capital case, the defendant should rely upon the stipulation of a former District Attorney—during whose term of office he had been indicted—to the effect that only certain witnesses should be called and examined, would not a Court be justified in refusing to hold the State bound by it? We are not aware of a stipulation like this ever having made its appearance before a Court. The cases cited by appellant throw no light on the question, because they all were in cases between private parties, and affected rights of strictly a private nature.

It is claimed that Melindy, McGrew, and Whipple are disqualified on the ground of section four of Article XI of the Constitution of this State. This interpretation cannot for a moment be maintained, because it would make the residence of the elector compulsory—that is, the fact of his being an employé of the Government would continue his previous residence, although he might desire to change it, and manifest that desire by the most unequivocal acts. Appellant says Dr. Melindy, although he removed from Siskiyou in 1861, had been in Mendocino two years; was engaged in raising stock and practising medicine, and was a voter; yet because he had the appointment as physician to the Indians on the Reservation, that, by force of the constitutional provision, made him a resident of Siskiyou.

It is not necessary to say that such a construction of the fourth section of Article XI is absurd. Its words, "*shall be deemed to have gained or lost his residence,*" mean that the Government employment shall not operate so as to give him a residence at the place where his duties are to be performed, nor to subtract from him his previous residence. In other words, it leaves the elector free to fix the place of his residence

by appropriate acts; and this is just what *Orman* v. *Riley*, 15 Cal. 48, decides.

By the Court, SANDERSON, C. J.

It is first claimed by the appellant that the District Court had no jurisdiction in the premises, and that the only remedy in cases like the present is under the statute which prescribes the mode and manner ,of contesting elections. (Wood's Digest, p. 380, Sec. 51.) No proposition could be more untenable. It is true that the Act providing the mode of contesting elections confers upon any elector of the proper county the right to contest, at his option, the election of any person who has been declared duly elected to a public office, to be exercised in and for such county. But this grant of power to the elector can in no way impair the right of the people, in their sovereign capacity, to inquire into the authority by which any person assumes to exercise the functions of a public office or franchise, and to remove him therefrom if it be made to appear that he is a usurper having no legal title thereto. The two remedies are distinct, the one belonging to the elector in his individual capacity as a power granted, and the other to the people in the right of their sovereignty. Title to office comes from the will of the people as expressed through the ballot-box, and they have a prerogative right to enforce their will when it has been so expressed by excluding usurpers and putting in power such as have been chosen by themselves. To that end they have authorized an action to be brought in the name of the Attorney-General, either upon his own suggestion or upon the complaint of a private party against any person who usurps, intrudes into, or unlawfully holds or exercises any public office, civil or military, or any franchise within this State. It matters not upon what number of individual persons a right analagous in its results when exercised may have been bestowed, for the power in question none the less remains in the people in their sovereign capacity. It has been shared with the elector, but not parted with altogether. Sub-

stantially the same point was made in the case of *The People* v. *Jones*, 20 Cal. 50, without success.

It is next claimed that it is nowhere shown by the record that all the election returns of the various precincts were given in evidence, and hence it is argued that neither the Court below nor this Court can determine which candidate received the most votes. It may be true, as claimed, that the record does not state in so many words that all the returns were given in evidence, yet it is apparent from a comparison of the allegations of the complaint, not controverted, as to the number of votes cast, with the number as shown by the returns contained in the record, that such was the case. A formal statement that they were all introduced was not indispensable. If it appear in any manner that such was the fact it is sufficient, and we are satisfied from an examination of the record that all the returns were before the Court. Thus it is stated in the complaint that according to the count of the Board of Canvassers the relator received four hundred and eighty-eight votes, and the defendant five hundred and thirty, which is not denied in the answer. It is also stated in the complaint, and not denied in the answer, that the returns from Noyo Precinct, showing upon their face forty-eight votes for the relator and ten for the defendant, were rejected by the Board of Canvassers. These votes being added to the estimate of the Board, make the entire vote of the county stand for the relator five hundred and thirty-six, and for the defendant five hundred and forty—which is the exact vote as shown by the returns contained in the record. It is manifest, therefore, that all the returns were given in evidence, and that they are now before us.

Upon the face of the returns, as already stated, the defendant received five hundred and forty and the relator five hundred and thirty-six votes, giving a majority of four to the defendant. Upon the trial the Court found that the defendant received five hundred and thirty-five votes and no more, and the relator five hundred and thirty-seven, which was subsequently, at the hearing of the motion for a new trial, reduced.

to five hundred and thirty-six, giving the relator one majority. It is alleged on the part of the appellant that the Court erred in thus deducting from Holden's vote.

Two of these five votes so taken from Holden by the Court were deducted from the returns from Sanel Precinct, which shows thirty-one votes for Holden. The ballots cast at that precinct were introduced in evidence, having been obtained from the Clerk's office, where they are required to be kept at least six months by the Clerk (Statutes of 1863, p. 354, Sec. 35,) from which it appeared that thirty-one Democratic tickets were polled at that precinct. Holden's name was upon all of these tickets except two, from which, as appears on inspection, his name had been torn off. Whether his name was torn off from these ballots before they were cast by the parties casting them or afterwards does not appear. Upon that question no evidence was offered by either side, and no explanation attempted. Thus the question as to the number of votes received by Holden at the precinct in question had to be determined upon the evidence afforded by the certified returns of the officers of the election on the one hand and the ballots on the other. The Court below held that the ballots were the most reliable evidence, and we are of the opinion that its conclusion was not erroneous.

Prior to 1863 there was no rule of law requiring the preservation of ballots cast at an election for any purpose. On the contrary the Inspector of Elections was required to destroy them after the count and completion of the returns. (Wood's Digest, p. 378, Sec. 35.) But in 1863 the law was amended so as to require the Inspector to string the ballots on a cord or thread, and return them with the poll list and tally paper to the County Clerk, to be kept by him for at least six months. (Statutes of 1863, p. 354, Sec. 35.) And it was further enacted that any person might appear before the Board of Canvassers on the day appointed for opening the returns and demand a recount of the ballots if he had any reason to believe that they had not been correctly counted by the officers of the election.

The Legislature could have had no other design in thus providing for the preservation of the ballots than to make them evidence of their own contents and a test of the correctness of the returns made up from them by the officers of the election. They are in fact made a part of the returns, for it is expressly provided that they shall be sealed up with the poll list and tally paper, with the certificates of the officers attached, and indorsed "Election Returns." Thus they are recognized by the law not only as a part of the election returns, and therefore evidence of what transpired at the election, but as evidence of a higher and more satisfactory grade than the tally paper. Intrinsically considered, it must be conceded by all that the ballots themselves are more reliable, and therefore better evidence than a mere summary made from them. Into the latter errors may find their way, but with the former this cannot happen. The relation between the two is at least analagous to that of primary and secondary evidence. This we do not understand the learned counsel as controverting, but he insists that the use of the ballots as evidence is limited to a test of the correctness of the tally paper on the day appointed for the Board of Canvassers to open the returns, and that on that day they become and thereafter remain *functus officio*. That such was the intent of the Legislature we cannot admit. In no event can the Board of Canvassers postpone the opening of the returns beyond the second Monday after the election. (Statutes 1861, p. 529, Sec. 38.) If at that time it was intended that the ballots should become *functus officio*, and thereafter cease to be a part of the official returns of the election, why provide that they should be preserved and kept by the Clerk for at least six months? Why not direct that they should be destroyed by the Board of Canvassers, as was done by the Inspector under the law as it stood prior to the amendment of 1863? In the same section requiring the ballots to be preserved, we also find a provision requiring the Inspector to retain and preserve for at least six months a poll list and tally paper with the certificates of the officers attached. This provision was part of the law prior to

the amendment of 1863, requiring the ballots to be preserved, and could have had no other object than to guard against the loss or fraudulent interference with those sent to the Clerk's office, and to furnish additional evidence of what transpired at the election. It is, therefore, manifest that the amendment of 1863, requiring the preservation of the ballots, had a like object, and was enacted for the purpose of further assurance.

Being, as we hold, competent, it is clear that the ballots are primary evidence, and therefore better evidence of the number of votes cast, and for whom, than the tally list made from them by the officers of the election. We must presume that the officers of the election honestly performed their duty in the premises; that they did not mutilate any of the ballots, but on the contrary strung them in the condition in which they were found in the ballot-box on a thread, and sent them in that condition to the Clerk's office. The same presumption exists in relation to their custody by the Clerk. In other words, in the absence of any evidence on the part of the defendant showing that the ballots in question were mutilated subsequent to their being deposited in the ballot-box, we are bound to presume that they were in the same condition when produced on the trial from the proper office and by the proper officer in which they were when deposited in the ballot-box. Any subsequent alteration or mutilation by any one intrusted by law with their custody would be a public crime of great enormity (Wood's Digest, p. 385, sec. 105;) and the commission of a crime cannot be presumed. (*The United States* v. *Amedy*, 11 Wheaton, 408.) If they were mutilated while in the Clerk's office it was the duty of the defendant to make proof of that fact. Not having been in the custody of the relator, but in that of the proper public functionary, he was not called upon to explain when or how the name of the defendant was torn off. The presumption, as we have already seen, was that his name was torn off by the voters themselves. Upon this presumption the relator could rely, and the labor of overthrowing it rested upon the defendant, who made no effort in that direction.

There is no force in the argument that the ballots are liable to become mutilated, and ought therefore to be considered of less weight as evidence than the tally list. The officers are required to string them on a cord or thread, and seal them up in a package, and deliver, or cause them to be delivered, to the County Clerk, whose duty it is to safely keep them for at least six months, and the presumption is that he has done so.

It is next claimed that the Court below erred in deducting from Holden's tally the vote of J. M. Neil, cast at Calpella Precinct. The Court found that Neil voted twice for Holden, and it is sufficient to say that, in our judgment, the finding is fully sustained by the evidence. According to the poll list the fourth vote cast at Calpella Precinct was cast by J. M. Neil, and the ninety-second and last vote was also cast by J. M. Neil. That these two votes were cast by the same person and not by two different persons of the same name, there can be no doubt. Neil himself testified that to the best of his recollection he voted in the afternoon, near sundown, for the defendant Holden. It further appears from his own testimony, and that of Mr. Cooley, one of the judges of the election, that on the evening of the election he asked to have his name erased, claiming that he was intoxicated and did not know at the time that he had voted before. There was also evidence tending to show that there was no other person of that name at that precinct, and none to the contrary. The first vote was legal, but the second was not, and the Court did not err in excluding it.

We are also of the opinion that the finding of the Court as to the residence of W. R. Robinson, who voted for Holden at Calpella Precinct, was correct. He left Mendocino County with his family in April, 1863, and went to Sonoma County with the declaration in effect that he was going there to reside. And from that time until and on the day of the election his family continued to reside in the latter county. The most that can be said on the side of the defendant is that the evidence as to Robinson's residence was conflicting. Such being the case, this Court will not disturb the finding. The fact of

residence being found against him, Robinson's vote was properly rejected.

Nor did the Court err in rejecting the vote of John Carroll, cast at Gualalla Precinct. He came to the county on the 22d of September, and the election was held on the 21st of October following. In order to make thirty days, it would be necessary to count both of those days and the whole of each. The language of the Constitution and of the statute is that the voter must have resided in the county thirty days next preceding the election. In our judgment this language means that he must have resided in the county thirty days next preceding the day of the election. But conceding that it means next preceding the event of the election, such event cannot be said to have transpired until sundown on the day of the election, and a residence of thirty days in Carroll's case would not therefore have been complete until after the polls were closed.

We are satisfied that the foregoing five votes claimed by defendant were properly rejected by the Court, and that the finding that he received only five hundred and thirty-five legal votes was correct.

We now come to such of the votes, which were allowed and counted by the Court for the relator, as are claimed by the defendant to have been illegal.

It is first claimed that two votes at Sanel Precinct were improperly counted for the relator by the Court. It appears from the record that two ballots or pieces of paper with the name of the relator and the names of the other candidates of his party printed thereon three times were found in the ballot box and rejected by the officers of the election. At the trial the Court counted each of these ballots as one vote for the relator.

It is claimed that these pieces of paper were each three tickets folded together, within the meaning of the thirty-fourth section of the Act regulating elections, (Wood's Digest, p. 378,) which provides that where two tickets are found folded

together, they shall both be rejected. In our judgment this point is not well made.

The twenty-fourth section defines a ballot to be " a paper ticket containing the names of the persons for whom the elector intends to vote, and designating the office to which each person so named is intended by him to be chosen." Thus a ballot, or a ticket, is a single piece of paper containing the names of the candidates and the offices for which they are running. If the elector were to write the names of the candidates upon his ticket twice or three or more times, he does not thereby make it more than one ticket. So long as there is but a single piece of paper there can be but one ticket, and if it can be discovered therefrom who are voted for and the offices for which each was intended to be chosen, it must be counted as one ballot, notwithstanding the voter may have, through inadvertence or otherwise, repeated the names and offices. Being but one piece of paper it can be but one ticket, and can only be counted as one vote. Cushing, in his work on the law and practice of legislative assemblies, at page 40, section 106, observes: " If a ballot happens to have the same name written or printed on it more than once, it is not therefore to be rejected, because as it is but one piece of paper it cannot be counted as more than one vote, and, though the same name is written on it several times, it is yet but one name. Thus, where ballots are prepared for distribution in the usual way practised in some of the States—that is, by the name of the candidate being written or printed several times on the same slip of paper, for the purpose of being cut into separate ballots, and being nearly cut apart, but so as to adhere together at one end—and an elector inadvertently puts two votes not entirely separated into the box, they will be counted as one ballot, unless there are circumstances present which afford a presumption of fraudulent intent, in which case they must either be rejected or the whole ballot set aside."

Nor did the Court err in allowing to the relator the votes of Melindy, Whipple and McGrew. The objection taken by the defendant to their votes is not well founded. They were not

disqualified by reason of section four of Article Second of the Constitution. That section does not add to or take from the conditions upon which the fact of residence is made to depend. It merely declares that "no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States," which means simply that in determining the fact of residence, presence or absence in the service of the United States shall not be taken into account, or, in other words, neither presence nor absence in the service of the United States is a condition upon which the fact of residence can be affirmed or denied. Hence the mere fact that Melindy came to Mendocino County in the capacity of physician, McGrew in the capacity of Supervisor, and Whipple in the capacity of laborer to the Indian Reservation, did not deprive the first of his former residence in Siskiyou, nor the second of his former residence in Sutter, nor the last of his former residence in Contra Costa. Nor did it preclude them from acquiring a residence in Mendocino, if disposed to do so. That it was their intention to acquire a domicile in Mendocino County sufficiently appears from the evidence. Such being the case, there is nothing in the constitutional provision in question (which is merely declaratory of the common law) which stands in the way of their doing so.

The claim that the Court allowed to the relator two votes folded together and found in the ballot box at Round Valley Precinct is not sustained. Whether the two ballots in question were folded together or not was a question of fact for the Court below to find, and that Court found that the evidence failed to prove it. The affidavit of Eberlee, who was Inspector at that place, used on the motion for a new trial, fully explains the alleged irregularity, and shows that, in fact, the two ballots were not folded together. Upon comparing the number of ballots with the poll list, it appears that there were no more ballots cast than there were persons who voted, thereby showing that in all probability the two ballots in question were not cast by the same person.

18

So far as the vote of John Ward at Calpella Precinct is concerned, counsel for defendant is mistaken in supposing it was counted by the Court for the relator. The Court in effect found as a fact that Ward did not vote for the relator, but for the defendant; and we think the finding is sustained by the evidence. If Ward was a minor and he voted for the defendant, another vote ought to have been taken from him. The Court, however, so far as we are able to discover, allowed Ward's vote to stand. Of this action, at least, the defendant ought not to complain.

In regard to the points made by counsel for the defendant upon the stipulations of the 23d of June and the 7th of July, it is sufficient to say that in the progress of the case thereafter until the actual taking of the evidence to which they respectively relate, both parties seem to have virtually disregarded them. Thus, on the eighth day of July, the next day after the last stipulation was made, the defendant served notice of a motion for leave to file an amended answer, said motion to be heard on the 18th of the same month. The motion was allowed and the amended answer filed on that day. On the next day—the 19th—the plaintiff filed an amended complaint, and on the same day the Court made an order, on the motion of the defendant, directing that the amended answer be considered as the answer to the amended complaint. On the 9th of July—the next day after the notice of the defendant to the effect that he desired to amend his answer—the plaintiff obtained an order from the Judge of the Court allowing further time to take testimony, which was served on the opposite party.

What effect the amendments to the pleadings may have had upon the issues as they stood at the time these stipulations were made, we are unable to determine, for the original pleadings are not in the record. It may be that the relator could have safely gone to trial upon the issues as they then stood upon the evidence already taken at the time the stipulation was made, but could not if those issues were to be changed.

Moreover, it is very doubtful whether these stipulations

were ever binding upon the people who were the real plaintiffs in the case. They were not made by the Attorney-General by whom the suit was instituted, but only by the private counsel of the relator. Theoretically the people alone are interested in the determination of the controversy involved in this case, and no Court would be justified in enforcing as against them a stipulation made by the relator or his counsel to their prejudice. The action is in no legal sense under the control of the relator. It was brought in the name of the people and to enforce their will as expressed through the ballot box and not merely to redress the wrongs or enforce the rights of the relator. (*Searcy* v. *Grow*, 15 Cal. 119.) It is very evident that the case could not have been fairly tried or its merits reached upon the evidence taken prior to the 7th of July, for the evidence then in only disclosed about one third of the official vote of the county, and it would have been impossible to determine upon the real merits of the case whether the defendant or the relator had been elected. Under all the circumstances, we think the Court might, in its discretion, allow the additional evidence to come in. Then the only question remaining would be whether the defendant was surprised; if so, he would have been entitled to a postponement of the trial in order to procure further evidence on his side, if there was any within his reach. But although he knew that the evidence had been taken by the referee and would be reported to the Court and might be received, yet, when it was received he did not claim that he was thereby surprised, and therefore not ready to proceed with the trial. On the contrary, he was silent, and with full knowledge of all the facts, took the chances of a finding in his favor. It will not do to say, as he now does, that he did not ask for an adjournment because he was precluded from so doing by the stipulation in question. The stipulation having been disregarded by the other side and by the Court was no longer obligatory upon him. This must have been known to both him and his counsel.

The record in this case contains nearly three hundred printed

pages. It is manifest that the whole case could have been fully and fairly presented in a record containing, at the outside, not more than fifty pages. For this we are satisfied that the respondent was, in a great measure, responsible. He must therefore be taxed with half the costs of making up and printing the transcript.

Judgment affirmed, with costs, except as above directed.

SHAFTER, J., dissenting.

The Court below found that the defendant received five hundred and thirty-five legal votes and the relator five hundred and thirty-seven, and that finding is regarded as correct by my brethren. For the purposes of the argument I shall make no question except upon the votes of Melindy, McGrew and Whipple, cast and counted for the relator. Deduct those votes from those thrown for the relator, and the majority will be with the defendant. Counsel agree that those three persons while living in the County of Mendocino, were in the service of the United States.

The fourth section of the Second Article of the Constitution is as follows : " For the purpose of voting no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States, nor while engaged in the navigation of the waters of this State or of the United States, or of the high seas, nor while a student of any seminary of learning, nor while kept at any almshouse or other asylum at public expense, nor while confined in any public prison."

Now, if the persons named acquired a residence in Mendocino County, how or by reason of what fact or facts did they acquire it ? No reply can be given to this question which does not put the fact of their " presence " in that county as one of the grounds or " reasons " of the result. But that presence was " while they were employed in the service of the United States," and therefore " they shall not be deemed to have gained a residence by reason of it."

The opinion of my brethren goes upon the idea that if a citizen, having a residence in a given county, enters the military or civil service of the United States and goes to another county and lives there, partly for the reason that it is his duty so to do and partly for the reason that he wishes and intends to change his domicile; or goes solely on the score of duty, but being on the ground, concludes to make the new county his permanent home, and manifests this purpose by appropriate conduct, that, in that event, his presence in the new county may avail him notwithstanding he may continue in the public service. The difficulty in. the way is, that the Constitution provides expressly that his presence while in the public service shall not avail him. The fallacy lies in striking out the words "while employed" and inserting the words "as employé." "While" goes to time, or duration. "As" goes to character or quality. Had the provision been that "no person shall be deemed to have acquired a residence by reason merely of his presence as employé of the Government," perhaps such employé might say: "My presence is not to be referred solely to my employment; I came here for an entirely distinct reason, moving me in my capacity as a citizen." But the constitutional inhibition has no reference to the man nor to his capacities or purposes as such. It goes, instead, upon the relation which the individual bears to the Government, and provides that "while" or during the time that the relation shall subsist, the "presence" of the party shall "for the purpose of voting," be as though it were not. In the treatment of the point now in question, no use whatever can be made of the "presence" of Melindy, McGrew and Whipple in the County of Mendocino. If each acquired a voting residence there, it must have been by force of the facts proved—less the fact of the personal "presence" or inhabitancy. But that is impossible.

Further—It is clear that all the different classes of persons enumerated in the fourth section of the Second Article of the Constitution are subjected to a common rule. Whatever is true as to one, is applicable to all. Now, this being given, it

follows, that a person who having his residence in a foreign county, should procure admission as a pauper to the almshouse in the City and County of San Francisco, and should be kept there thereafter at public expense, might claim, on the ground of the opinion from which I feel myself compelled to dissent, that he had "by reason of" his "presence" in the county "while kept in the almshouse at public expense," acquired a right to vote in the county, in the event he could show that he went to the county, or that after he got there, he remained for a double purpose, viz : to afflict the county by his "presence" as a pauper, and to distinguish it by his "presence" as a citizen, after the lapse of thirty days. And whatever is true as to a pensioner upon the public charities, is equally true as to convicts in the public prisons.

It is unnecessary to refer to the historical causes that induced the adoption of the constitutional provision under discussion, or to remark that the habits of mind developed under our system of government, leave little room for the operation of those causes here. But, however it may be now, it is apparent that the force of traditional opinions had neither been broken nor seriously impaired at the time the Constitution was adopted. If the views of the people have changed since it is clear that we cannot notice the change so long as the Constitution remains as it is.

Under the views I take of the case, the judgment should be reversed, and judgment be entered in favor of the defendant affirming his title to the office in dispute.