IN THE CIRCUIT COURT FOR WASCO COUNTY.—AT CHAMBERS, JULY, 1870.

## JOHN DARRAGH, PLAINTIFF, v. JAMES M. BIRD, DEFENDANT. †

ELECTION CONTEST.—PRECINCT.—An elector should vote for county officers only in the precinct where he resides.

PARDON.—A pardon by the executive does not restore to a person convicted of felony the rights of an elector. ‡

RESIDENCE.—Every person must have some fixed place of residence, or must labor under a disability that neither the law nor the courts can relieve. The mere passing in and out of a precinct will not establish a residence, although the person's occupation may be such as to make it inconvenient to vote at any other place, or if he has no fixed place of residence.

CHALLENGE.—Whenever a person is challenged by a legal voter, unless such challenge is withdrawn, he has no right, unsworn, to vote; nor can the judges receive such vote.

CLOSING POLLS.—After the hour for closing the polls, they cannot be opened again.

RESIDENCE.—An intention to remove immediately after the election does not amount to a change or loss of residence; there must be a union of act and intention.

BURDEN OF PROOF.—A party attacking a voter who has voted must show that he is disqualified.

EMPLOYEES OF THE GOVERNMENT.—Although residence cannot be gained or lost by reason of the person's presence or absence, while employed in the service of the United States, yet one so employed may change his residence.

REJECTED VOTES.—All rejected votes should appear on the poll book in the manner prescribed in sec. 18, p. 701, of the compiled laws.

NATURALIZATION.—One who has obtained his final citizen papers, becomes a voter at the time of being naturalized.

---

* Affirmed at the September term of 1870.

† By stipulation the cases of *Woods* v. *Fitzgerald and Wingate; Mays* v. *Fitzgerald and Wingate*, and *McFarland* v. *Holland*, were submitted on the same evidence.

‡ Reversed. See *Wood* v. *Fitzgerald et al. post.*

CHALLENGE—PROOFS.—Judges of election have no right to reject votes without any evidence that they are illegal, the voter not being challenged, or having taken the prescribed oath. If they desire other proofs beyond the voter's sworn statement, the evidence must be produced at the time he votes.

ELECTION CONTEST—WILL OF MAJORITY.—In a contest, the will of a majority of the legal voters, as expressed by their votes, must be carried into effect.

The facts appear in the opinion filed.

WHITTEN, J. This is an action brought to contest the election of the defendant to the office of sheriff of Wasco County, Oregon; to which office defendant claims to have been elected at a general election, held in said county on the sixth day of June, A. D. 1870. Plaintiff claims that he received a greater number of the legal votes at said election, for said office, than did the defendant, and is therefore entitled to said office. Plaintiff alleges that J. B. Blanpied, J. Liddy, L. Manning, T. H. Williams, W. C. Smith, J. S. Becky, and divers other persons, whose names are mentioned in plaintiff's complaint, voted at such election for the defendant for the office of sheriff in said county, and that such votes were illegal, and should not have been counted for the defendant; that said persons were not, at the date of their voting, *bona fide* residents of Wasco County or the precincts therein. Plaintiff further alleges that at the time and place of holding said election in said county, Peter Runey, R. Graham, Wm. McKay, and divers other persons whose names are set forth in the complaint of plaintiff, were qualified electors of Wasco County, and legally entitled to vote; that said persons did appear at the polls and offer their votes for this plaintiff for said office, and were prevented from voting at such election for this plaintiff, through the illegal acts of the judges of said election. Plaintiff claims that said illegal votes as received, recorded and counted for the defendant, should not have been counted for him, and that the votes which were offered for plaintiff, and by the judges of election rejected, should be counted for plaintiff; and that if the illegal votes which were received were deducted from the whole number of votes which de-

fendant received for said office, and the votes which said judges really rejected were added to plaintiff's vote for said office, it would entitle plaintiff to said office. Plaintiff claims that there is one more vote counted for defendant than should have been counted, and there is one vote which should have been counted for plaintiff that was not counted for him.

The defendant, for answer, denies that plaintiff is entitled to said office, or that he received a greater number of the legal votes at said election for such office than did the defendant. Defendant admits that J. B. Blanpied, J. Liddy, T. H. Williams and others voted at said election in said county for him for said office, but denies that said votes were illegal—denies that Peter Runey, William McKay and others were on said day of election prevented from voting for plaintiff through the illegal acts of the judges of said election; denies that such persons were at said date *bona fide* residents of Wasco County, or that they were legally entitled to vote; denies that said votes so offered should have been recorded and counted for the plaintiff. Defendant admits that there was one more vote counted for him than should have been, but denies that there was one less counted for plaintiff than should have been counted; and, for a further defense, defendant alleges that on the day of said election in said county, Jesse Snooks, E. Kinney, Wm. Kelly, Gustave Hines, and divers other persons named in defendant's answer, voted for plaintiff for said office, and that said persons were not, at the date of their so voting, *bona fide* residents of Wasco County, and the precincts therein, and that such votes were illegal and should not have been counted for the plaintiff. Defendant then sets up some votes which were rejected, and claims that such votes would have been thrown for defendant had they not been rejected, and that they should be counted for defendant. To this, plaintiff replies, making a complete denial of all the affirmative allegations set up in the answer.

Having thus briefly stated the issues in this case, they will be considered in the following order:

1st. The names of R. Henderson, E. Kinney and M.

Meng—Kinney voting for plaintiff, the other two for defendant—are submitted on an agreed statement. Henderson, it is admitted, was a resident of East Dalles precinct on the day of election, and that he voted in Sutton's precinct. Sec. 17 of Article II. of the constitution of Oregon, declares that "all qualified electors shall vote in the election precinct in the county where they may reside, for county officers," etc. Henderson's residence being admitted to be in East Dalles precinct on the sixth day of June, that being the day on which the election was held, he could not have legally voted in any other precinct for county officers, and there being no controversy as to where he did vote on that day, his vote for the office of sheriff, that being a county office, was illegal and should not be counted for the defendant. E. Kinney voted for plaintiff in East Dalles precinct and had declared his intentions to become a citizen of the United States less than one year immediately preceding the election. By reference to sec. 2, Art. II, of the constitution, it will be seen that to entitle a person of foreign birth to vote at an election, he must have declared his intention to become a citizen of the United States one year immediately preceding such election, conformably to the naturalization law. Kinney's case does not come within this provision, and he had no right to vote. M. Meng, who voted for defendant in East Dalles precinct, is a person, as appears by the agreed statement, who had been convicted of the crime of arson, and had been an inmate of the penitentiary of this state, and had been pardoned out before the expiration of his sentence. Sec. 14, Article V, of the constitution, gives to the governor of the state the power to grant pardons for offenses of this character. There can be but little doubt that the framers of the constitution, in giving this power to the governor of the state, were inclined to be as merciful toward the offender as would be consistent with public policy and public good. I cannot conceive it was the intention of those men to ever restore a person who had become so degenerate as to permit his passion to influence him to the commission of a crime involving both his civil and political condition to all the rights and privileges

he previously held when an upright man. It is an act of mercy, of which no one complains, that the constitution empowers the executive to pardon, to blot out the offense for which one is imprisoned and restore him to his civil rights ; but in order to prevent those who had any pride in their political rights from the commission of crime, they are made to know and understand that if they do so far lose their self-respect and the respect of others, there is no power in our constitution, our laws, or in the governor of the state, that can restore them to their political rights. Meng was, on election day, politically dead and had no right to vote.

2d. G. H. Kimberlin, G. Masterson, Z. Smith, Wm. Bramlette, J. McMullin, W. A. Scroggins, A. A. Straw, L. Manning, F. Bird, T. H. Williams, J. Liddy, T. Brannan, T. Penny, W. C. Smith and J. S. Becky are the names of persons who voted at said election, and that said votes were recorded and counted for the defendant. It is claimed by the plaintiff that some of those persons voted out of the precinct in which they resided; that others are not residents of the county, as will appear as they are taken up in their order. Defendant claims for them, that, as they have no fixed residence, and as the constitution does not require a person to be a resident of the precinct any particular time, they have a right to say that the precinct in which they may chance to be on the day for election is their residence for the time being, and that they can vote.

In passing upon the right of these persons to vote, I lay this down as the law, that every person must have some fixed place of residence—must have a domicil, or else he must labor under a disability that neither the law nor the courts can relieve. Residence is a matter of intention and act—it may be gained and retained without expense or trouble; it cannot be lost by mere temporary absence. It is claimed that these are persons whose occupations are such that they cannot make it convenient to be at a certain place on the day of an election. Suppose they cannot, then they must content themselves by voting for just such officers as the law entitles them to do, and for none other. It is

true that irregularities without number have been permitted, or rather indulged in, and it is time they were corrected; and it makes no difference whether persons have voted ignorantly or willfully. If ignorantly, it is time they knew better; if willfully, it is time they were taught to obey and respect the law. For a person to claim that he has a right to vote wherever he may chance to be on election day, and that, if in a precinct other than the one he was in, he could claim the former as his residence, is not only contrary to law, but to common sense. All general laws are intended to confer the greatest good upon the greatest number, and to attempt by specialty to legislate, so as to meet individual wants and circumstances, would be preposterous. Apply these principles to the facts of the case, of those above mentioned, and what will be the legal conclusion? Kimberlin voted in Sutton's precinct. From the evidence, it is my opinion that Kimberlin had no such residence in Sutton's precinct, as would entitle him to vote for county officers—Kimberlin admitting that if he had been in the Dalles, or elsewhere on the day of election, he would have claimed that other place as his residence. The mere passing in and out of a precinct, will not establish a residence—it is nothing more than an occupancy; the person for the time being simply an inhabitant. George Masterson voted in Sutton's precinct, and his condition is very similar to that of Kimberlin, and the evidence about the same. His residence, if he had one at all, in my opinion, was in Antelope precinct—and he had no right to vote for county officers in the precinct in which he did. Z. Smith voted in Antelope precinct. The evidence shows that Smith came into Wasco County in February last, and then declared that he intended to vote in this county, and make this county his residence. This, I think, was sufficient to entitle Smith to vote, though he might have been temporarily absent afterwards, and that his vote was properly received and counted for defendant. William Bramlette voted in Sutton's precinct, and swore in his vote. This, of itself, is sufficient to entitle him to vote, until the contrary is shown. There is evidence of his having left some of his effects in said pre-

cinct, and that he had a contract in said precinct partially finished.

The evidence also shows that he had left the precinct, and only returned on the morning of the election, and then voted and again left. There is nothing in the evidence to show that he did not intend to return when he left the first time, and the presumption corroborated by the act of his coming back, is strong in his favor that he intended to come back, and his vote was rightly counted. J. McMullin voted in Fifteen Mile precinct; that the dividing line between Fifteen Mile and Tygh precincts is the dividing ridge between Fifteen Mile and Tygh creeks; that McMullin lives on waters of a stream that runs into Tygh creek, but that it is some distance north of the divide, Fifteen Mile creek being north of Tygh creek. The evidence shows that the stream on which McMullin lives runs through a gap in the divide between Fifteen Mile and Tygh, thus breaking the ridge which is the natural boundary between said precincts. I think the true rule in determining the boundary line between the two precincts where it is broken by a gap, as shown from the evidence, would be to draw a line from one point of the ridge to the other across the gap. To do this would leave McMullin north of the ridge, and consequently in Fifteen Mile precinct. From the facts here shown, McMullin's vote was properly received and counted in that precinct for defendant. W. A. Scroggins, L. Manning and A. A. Straw voted in John Day precinct. There is no doubt in my mind but that Scroggins, Manning and Straw were, at the date of their voting, residents in Antelope precinct, and that they had no legal right to vote in any other precinct for county officers, and such votes should not be counted for defendant. From the evidence, I have no doubt that Frank Bird was, at the time he voted, a resident in John Day precinct, and that his vote was properly recorded for defendant. T. H. Williams, a boatman, with no fixed residence, voted in Mosier's precinct—a case in every way similar to Kimberlin's. J. Liddy voted in West Dalles precinct; had removed to Portland with his family in last March, leaving no traces of residence whatever behind him;

came to West Dalles in the afternoon of day of election, voted and returned to Portland next day. I cannot think that Liddy had any residence in Wasco County on the day of election; certainly he had none in law, and if not, he had no legal right to vote, nor should it be counted for the defendant. T. Brannan and T. Penny voted in West Dalles precinct. The evidence as to their residence is somewhat unsatisfactory. Their votes are attacked by plaintiff, and it devolves upon him to show affirmatives that they had no right to vote. There is doubt in my mind whether they were *bona fide* residents of Wasco County on the sixth of June; and I think there is sufficient reason to warrant me in rejecting them. W. C. Smith and J. S. Becky voted in the West Dalles precinct. From the evidence, there is no doubt but at the date of their voting they were residing in Grant County, and were here temporarily purchasing goods for transportation. It is my opinion they had no right to vote. J. B. Blanpied voted in East Dalles precinct. Whether Blanpied had resided in the state six months next preceding the sixth day of June last, or not, will make no difference in determining his right to vote, as other facts plainly settle this question. But were this the only evidence upon which to determine it, I should, from Blanpied's own statement, have no hesitancy in deciding the case. When Blanpied offered his vote, he was challenged by a legal voter. That challenge was insisted on, and never withdrawn, Blanpied positively declaring he would not be sworn, and the judges as positively refusing to swear him. Under these circumstances he voted. The law so plainly settles this question, that to say anything further than that Blanpied had no right whatever to vote would be superfluous. (Code, p. 700, sec. 13)—Whenever a person is challenged by a legal voter, unless such challenge be withdrawn, he has no right, unsworn, to vote; nor can the judges, without disregarding the law and their own obligation, receive such vote. The law then gives no discretion in the matter—they must reject it.

R. Myers voted in West Dalles precinct. There is no question raised as to Myer's qualifications as a voter. It is claimed that he voted after the polls had been closed. The

law fixes the time for opening and closing the polls. (Code, p. 699, sec. 11.) Myers knew what time the polls closed, and if for any cause he stayed away until they were closed, it was his own fault. The polls could not be opened again for his accommodation. In this case the evidence is somewhat conflicting as to whether the polls had been ordered closed at the time Myers voted, or not. After a careful examination of the testimony, it is my opinion that the polls were closed before Myers voted—the evidence greatly preponderates in favor of this opinion, and comes from witnesses who are least liable to be influenced by their prejudices.

For the defense it is claimed that H. Gulick, C. Cruver, C. Dunlap, George and Isaac Chapman, G. Hines, C. Fales, Wm. Murphy, T. Shelly, J. Cunningham, A. Strong and J. M. Thompson have not resided in the state or county the necessary length of time prior to the election to entitle them to vote. It is my opinion that, from the acts and declarations of the parties, except Thompson, as shown by the evidence, they were on the day of election *bona fide* residents of this state and county, and as such were entitled to vote— G. Hines is here in the capacity of a minister of the Gospel, and as such had been here about eight months prior to the day of election. I will make no comment in his case. There can be no doubt but that he had a right to make the Dalles his place of residence, and to vote there, if he chose to do so. C. Fales—there is but little objection made as to him. He no doubt had a right to vote. Murphy had been temporarily absent for his health. He swears he intended to return when he went away; and the fact that he did return is the very best evidence of his intention to do so. His residence was not affected by his temporary absence. He had a right to vote. T. Shelly came here as a teacher; came from one of the counties west of the Cascades. Soon after his arrival he declared his intention to make this his residence—so declares it now—was in the county more than ninety days prior to the day of election, and was clearly entitled to vote. Cunningham had been in the state and county about two years. It is said that because he had a family

in New York he could not gain a residence here. This position is not correct. Suppose a man leaves his family in California and comes to Oregon, seeking for a place to which to remove his family. He is here six months, has made arrangements for the removal of his family hither. An election is held, his family has not arrived, may never arrive. Circumstances that he could not foresee have changed his intentions; he sees a plan where he can better his condition —may have made up his mind to remove thither. In the meantime an election is held. Would the fact that he had made up his mind to remove to some other place deny him the right to vote? Certainly not. Such circumstances may cause any of us to change our residence, for we will all do so when we think we can better our condition, and without affecting our right to vote. Strong stands on his own evidence; he voted, and the presumption is that he had a right to vote. He swears this was his residence. This, with the fact that the party attacking the legality of his vote, has failed to show anything to the contrary, is satisfactory to my mind that he had a right to vote. Gulick, Dunlap, the Chapmans and Cruver, it is said, removed from Washington Territory, or at least that the two Chapmans and Dunlap did, and have not been in the state the required time to entitle them to vote. I think the evidence shows satisfactorily that they have resided in the state more than six months prior to the sixth day of June last, and were entitled to their votes. As to Gulick, Cruver and Thompson, it is claimed that on the day of election they were residents of Washington territory, and therefore had no right to vote. As to the two first, I have no hesitancy in declaring the legality of their votes. I have serious doubts whether it was Thompson's intention, when he moved across the river, into Washington territory, to any longer claim Oregon as his residence, and the evidence being unsatisfactory, I shall, for the purpose of this action, refuse to count it for plaintiff.

I. L. Curry, J. Snooks, F. Zeller, A. J. Brown and C. Sergeant, it is claimed, are persons who voted out of the precinct in which they resided. There is very little difficulty in deciding as to Snooks, Zeller, Sergeant and Curry.

Sergeant voted in East Dalles precinct. The evidence shows that on the sixth day of June, the day of election, he resided in that precinct, and his vote should stand.

Snooks and Zeller both voted in East Dalles. The evidence shows their residence on that day to be in West Dalles. Their votes should not have been recorded for any of the county officers. Curry voted in Antelope precinct. I think from the evidence his residence is in Sutton's precint, where he should have voted. Brown is one of those cases where a person slept in one precinct and boarded in another; but, in giving his testimony as to his residence, he says "I think where Thomas Smith lives is my residence." Smith lives in West Dalles; Brown voted in East Dalles. If Brown was in doubt as to which precinct he resided in, he should have informed himself in time—it is too late now. I think from Brown's own evidence he should have voted in West Dalles precinct. The rule which I have applied to the case of Strong and others—that the party attacking a voter must show in what respect he is disqualified, or the vote must remain undisturbed, will apply to the case of M. Cain, who voted in Fifteen Mile precinct, and to C. Gonzales, who voted in Tygh precinct, and to La Fraties and Hansel and Huerta, who voted in East Dalles precinct. B. P. Cardwell, Jacob Fritz, and others of like circumstances, it is claimed, are disqualified from voting, for the reason that they are in government employ. Many have fallen into this error for the reason that they make no distinction between an employee of the government and a soldier, seaman or marine. Sec. 4 of article II. of the constitution says: "For the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States or of this state." Sec. 5 of the same article says: "No soldier, etc., shall be deemed to have acquired a residence in the state in consequence of having been stationed within the same, nor shall he have the right to vote." The question of residence being one of act and intention, the framers of the constitution left the matter entirely to the discretion of the parties themselves. They say we will

neither enlarge or restrict the right of persons in this respect, but leave it with them to elect as to where they will claim their residence. The difference between sections 4 and 5 is this: In the 4th the language is "for the purpose of voting," etc., evidently intending that the person himself should make the place of his choice his residence. Sec. 5 is: "No soldier," etc., "shall be deemed," etc., giving to him no discretion in the matter. *People ex rel. E. R. Budd* v. *W. Holman* (28 Cal. 123) is a case in point, and very similar. Suppose that a person residing in Wasco County were to go to Salem, in Marion County, to work on a state building, and were to remain there two or three years, would it be contended that he had acquired no residence in that county, because he had been an employee of the state. The fact that he is such employee does not deprive him of his right to elect whether he will retain residence in Wasco County, or whether he will abandon it and adopt another, and the principle is precisely the same whether he be an employee of the state or of the United States. B. P. Cardwell and Jacob Fritz had as much right to vote the state and county ticket on the 6th day of June for state and county offices as the oldest residents of Wasco County had. Another question arises, which may as well be settled here as elsewhere. Code, p. 700, sec. 14, says: "If any person so offering to vote shall take such oath, his vote shall be received, unless it shall be proved by evidence, satisfactory to a majority of the judges, that he does not possess the qualifications of an elector, in which case a majority of said judges are authorized to reject such vote." The only point to be determined here is, must a person, whose vote is rejected for any cause, be entered on the poll books as such? There are some grounds for the opinion, that a rejected vote need only be entered on the poll book, with the names of the persons for whom he wishes to vote, when he is challenged for disloyalty, as will be seen by reference to Code, p. 701, sec. 16, viz: that if a person's vote is challenged for the cause mentioned in sec. 13, and he takes the oath required, and is then rejected, that his vote need not be recorded, etc. I think that, for the protection of the voter,

as well as the person for whom he wishes to vote, the better
opinion is, that all rejected votes should appear on the poll
book in the manner prescribed in sec. 18, p. 701 of the Code
of Oregon.   Any other rule than this would give to the
judges of election the power of electing to office any person
they might prefer, by rejecting the votes of all those who
were opposed to the candidate of their choice.   Unless some
record be made of rejected votes, they would be entirely
lost to the person for whom they were intended, as will ap-
pear from an examination of that class which is claimed in
this action as legal voters and were prevented from voting
through the misconduct and illegal acts of the judges.   In
passing upon this point, now raised, I cannot, from the law
as understood, and to which I shall refer, consider those
rejected votes in a manner that will change the result of
said election; and it makes no difference whether they were
properly or improperly rejected.   The only relief I can
afford is to carry into effect the express will of a majority of
the legal voters, as indicated by their votes.   (Code, p. 707,
sec. 41.)   In a contest, the only thing that can be consid-
ered by a court or judge is the illegal votes.   There is noth-
ing which authorizes a court or judge to open up the polls,
and count, for one of the contestants, votes that have been
rejected and left unrecorded by the judges of election.
*Webster* v. *Brynes* (34 Cal. 273) is a case in point.   Courts
and judges are powerless in a case of this kind, yet I deem
it but justice to those who were improperly rejected, for
there can be no question but that some of those offering to
vote had a legal right to vote, to refer to some plain pro-
visions of law, that the legal voters may in future be
protected from both ignorance and fraud—for it is a lament-
able fact that our elections are becoming corrupt, and the
proud boast of the *right of suffrage* of American citizens an
empty sound.   Our elections should be conducted honestly,
openly and fairly.   It is the foundation of a republican
government, and should be kept pure—and yet men dare to
tamper with this sacred right with impunity.   All good men
desire that this right should be kept inviolate.   The code,
page 696–707 (inclusive), declares in unmistakable language,

17

the manner of holding and conducting elections, and the legal rights of electors. Under the provisions of sec. 13, if a man, who has solemnly sworn to carry into effect such provision, can quiet his conscience by saying he did not intend to declare to a person, who offered to vote and was challenged, the qualifications of an elector, unless asked to do so by such voter, he should not be allowed to sit on an election board in any capacity.

H. Crellish, E. Bernard, E. A. Willis and P. McLaughlin, submitted, on agreed statement, voted for Darragh for sheriff, and their votes afterwards rejected all persons of foreign birth, no question as to the time they had resided in Wasco County. McLaughlin declared his intentions to become a citizen of the United States in 1851. Section 2 of Art. II of the constitution is sufficient as to his case; his vote should be counted. Crellish, Bernard and Willis obtained their final citizen papers less than six months prior to the election. I cannot see why a person of foreign birth, having proper residence, upon obtaining his final citizen papers, is not as much entitled to vote the day after he has obtained them, as the natural-born subject would be who attains his majority one day before an election. Their votes should be counted. R. Graham, D. L. Reynolds, J. S. Morgan, P. Runey, J. Bamford, A. Biddle, J. Sullivan, J. G. Paddleford, W. Tarrant, and others. It is unnecessary to discuss this class further, as reference has already been made to them, it appearing so palpable that no one need be mistaken unless he desired it. There is not a shadow of a doubt of the right of those persons to vote.

Wm. McKay, Battise, the Delords, Russi, and others of mixed blood, of whose legal right to vote I have some doubts, I will not decide (since it does not affect the result in this case) as to whether their votes were properly or improperly excluded.

Having thus carefully considered this case, I find:

That the judges of the election had no right to record votes upon the poll books and then refuse to count them, there being no evidence that they were illegal.

That if judges of the election desire other proof of the

competency of a voter, beyond his sworn statements, the evidence must be produced at the time he votes. An elector must have some precinct as a residence in preference to all others, to enable him to vote for county officers, and he must vote in such precinct. A person refusing to be sworn, when challenged by a legal voter, has no right to vote.

A person offering to vote, and being ready to take the oath prescribed by law, his vote should be received, unless it appears that he does not possess the qualification of a voter, and even then must be recorded as a rejected vote.

A person of foreign birth is entitled to vote from and after the date of his final citizen papers, having proper residence.

An employee of the government may, if he choose to do so, acquire a residence the same as any other citizen, and when so acquired, has a right to vote.

That in a contest the will of a majority of the legal voters must be carried into effect, as expressed by their votes. That, of the legal votes for the office of sheriff—John Darragh, 296—the votes of H. Crellish, McLaughlin, Willis, Bernard and Fritz, rejected by the judges, are now counted for said Darragh, and the votes of A. J. Brown, J. Snooks, F. Zeller, J. L. Curry and E. Kinney, having been counted by the judges for him, are here rejected. J. M. Bird received for said office 313 legal votes. The votes of J. Liddy, G. H. Kimberlin, G. Masterson, W. A. Scroggins, L. Manning, H. A. Straw, T. H. Williams, T. Brannan, T. Penny, W. C. Smith, J. L. Becky, M. Meng, J. B. Blanpied and R. Myers, counted for said Bird, are here rejected. Bird having received a greater number of legal votes for said office than did Darragh, it is hereby ordered and adjudged that he have and hold said office, and that he have judgment against the plaintiff for his costs and disbursements.

It is further ordered and declared that the costs and disbursements in this case be taxed at one fifth of the whole amount in all the five contested cases submitted. That in the case of *C. McFarland* v. *M. Holland*, contest for the county clerk, submitted on stipulation that the filings and

proofs in the case of *Darragh* v. *Bird,* stand for the pleadings and proofs in this case. Of the legal votes, C. McFarland received for said office, 303; H. Crellish, E. Bernard, E. A. Willis, J. Fritz and P. McLaughlin, votes which the judges of election refused to count for plaintiff, are here counted, and the votes of A. J. Brown, E. Kinney, J. Snooks, F. Zeller and J. L. Curry, counted for plaintiff, are here rejected. That of the legal votes cast, A. Holland receives for said office, 304; the votes of R. Henderson, G. Masterson, G. H. Kimberlin, W. A. Scroggins, L. Manning, A. A. Straw, T. H. Williams, J. Liddy, T. Brannan, T. Penney, W. C. Smith, J. S. Becky, M. Meng, J. B. Blanpied and R. Myers, were counted for defendant, and are here rejected. That Holland having received a greater number of the legal votes for said office than did McFarland, it is therefore ordered and adjudged that he have and hold the same, and that he have judgment against plaintiff for his costs and disbursements. It is further ordered and decreed that the costs and disbursements in this case to be taxed, shall be the one fifth of all the costs and disbursements in all the five contested cases submitted.

That in the case of *R. Grant* v. *Geo. Ruch,* contest for the office of county treasurer of Wasco County, Oregon; stipulations the same as in the case of *McFarland* v. *Holland,* of the legal votes cast, Grant received 296; that the votes of R. Henderson, G. Kimberlin, G. Masterson, W. A. Scroggins, L. Manning, A. A. Straw, T. H. Williams, J. Liddy, T. Brannan, T. Penney, W. C. Smith, J. S. Becky, M. Meng, J. B. Blanpied and R. Myers, were counted by the judges of election for plaintiff, and are here rejected; and that George Ruch received for said office of the legal votes, 311; the votes of H. Crellish, E. Bernard, E. A. Willis, P. M. McLaughlin and J. Fritz, were rejected by the judges, and are here counted for Ruch, and the votes of A. J. Brown, J. L. Curry, J. Snooks, F. Zeller and L. Kinney, counted for defendant, are here rejected. Ruch having received a greater number of legal votes for said office than did Grant, it is ordered and adjudged that he have and hold said office, and that he have judgment against said plaintiff

for his costs and disbursements. It is further ordered and decreed that the costs and disbursements to be taxed in this case, be one fifth of all the costs and disbursements in the five contested cases submitted.

In the case of *E. Wood* v. *Fitzgerald and Wingate*, contest for the office of county commissioner—stipulations the same as in the case of McFarland and Holland. Wood received of the legal votes for the said office, 311—the votes of H. Orellish, E. Bernard, E. A. Willis, J. Fritz and P. McLaughlin, not counted for Wood by the judge of election, are here counted for him, and the votes of A. J. Brown, J. L. Curry, J. Snooks, F. Zeller and E. Kinney, counted for him, are here rejected. That of the legal votes for said office, E. P. Fitzgerald received 301, and E. Wingate, 298—the votes of R. Henderson, G. H. Kimberlin, G. Masterson, W. A. Scroggins, L. Manning, A. A. Straw, T. H. Williams, J. Liddy, T. Brannan, T. Penney, W. C. Smith, J. S. Beck, M. Meng, J. B. Blanpied and R. Myers, counted for defendants for said office, by the judges of election, are here rejected. Wood having received a greater number of votes for said office than Fitzgerald or Wingate, and being duly elected to said office, it is therefore ordered and adjudged that he have and hold said office, and that the clerk of Wasco County issue to the said E. Wood a certificate of his election within ten days from the filing hereof, and that the certificates of election to said office heretofore issued to E. P. Fitzgerald and E. Wingate be each declared null and void as against the right of said Wood to said office, and that he have and recover from said defendants his costs and disbursements herein, and that the same be adjudged to be one fifth of all the costs and disbursements in the five contested cases submitted.

In the case of *R. Mays* v. *E. P. Fitzgerald and E. Wingate*, contest for the office of county commissioner—stipulations the same as in the case of *McFarland* v. *Holland*, of the legal voters for the said office, Robert Mays received 303—the votes of H. Orellish, E. Bernard, E. A. Willis, J. Fritz and P. McLaughlin, not counted for plaintiff for said office, are here counted; and the votes of J. Snooks, F. Zellter, J.

L. Curry, E. Kinney and A. J. Brown, counted by the judges for plaintiff, are here rejected—that E. P. Fitzgerald received of the legal votes for said office 301, and E. Wingate received 298—the votes of R. Henderson, G. H. Kimberlin, G. Masterson, W. A. Scroggins, D. Manning, A. A. Straw, T. H. Williams, J. Liddy, T. Brannan, T. Penny, W. C. Smith, J. S. Becky, M. Meng, J. B. Blanpied and R. Myers, counted for Fitzgerald and Wingate, for said office, are here rejected. Mays having received a greater number of the legal votes than did Fitzgerald or Wingate, was duly elected to said office. It is therefore ordered and adjudged that he have and hold said office of commissioner, and that the clerk of said county of Wasco issue a certificate of election to the said Mays within ten days from the filing hereof—and that the certificates of election to said office heretofore issued to E. P. Fitzgerald and E. Wingate be each declared null and void as against the rights of said Mays to said office—and that he have and recover from said defendants his costs and disbursements herein, and that the same be adjudged to be one fifth of all the costs and disbursements in the five contested cases submitted.

*Wilson,* for plaintiffs.

*Hummason & Gates,* for defendants.*