JAMES B. GANTT, Contestant, v. JOHN C. BROWN.
Election Contest.

**In Banc, June 26, 1912.**

1. **ELECTION CONTEST: Supreme Judge: Jurisdiction.** The Supreme Court has jurisdiction to hear and determine an election contest between two opposing candidates for Supreme Judge. Its jurisdiction is original in such case, although in all other cases except mandamus, certiorari, etc., its jurisdiction is appellate. The Constitution says that "the Supreme Court, except in cases otherwise directed by this Constitution, shall have appellate jurisdiction only;" and it is "otherwise directed" in the Constitution that "the trial and determination of contested elections of all public officers . . . shall be by the courts of law," and "the General Assembly shall, by general law, designate the court or judge by whom the several classes of election contests shall be tried;" and the General Assembly, in pursuance to said provisions, enacted a statute declaring that "all contested elections for Judge of the Supreme Court . . . shall be determined by the Supreme Court." So that its jurisdiction is complete.

2. ————: **Legislative Interpretation of Constitution.** A construction by the Legislature and Governor of a constitutional provision, as shown by the enactment of a statute by the one and its approval by the other, is not binding upon the courts; but when made soon after the adoption of the Constitution, and evidently done for the purpose of bringing the statutes into harmony with changes in the constitutional provisions, is persuasive argument of what those provisions mean.

3. ————: **Death of Contestant: Salary: Abatement.** The death of the contestant for a judicial office before judgment, the action being *inter partes*, abates the action. The action is purely personal; neither is the title to the office assignable nor its duties delegable; nor does the statute provide for any fitting judgment in case of contestant's death. The right to hold office is purely statutory, and the method of acquiring office is likewise statutory, and if there is no provision in the statute providing for a revivor of the action in case of the death of the contestant, or if it names no person who can be substituted in his stead, the action must abate. Nor does the fact that the salary of the office, which is a mere incident to the legal title, may follow as a result of a decision of the case, prevent an abatement of the action in case of the death of the contestant before judgment.

Gantt v. Brown.

Election Contest.

JUDGMENT FOR CONTESTEE.

*W. C. Marshall* and *W. M. Williams* for contestant.

(1) None of the ballots cast at the election in 1910 for the offices in contest (or otherwise) had indorsed thereon the registration or line number of the voter casting the same, and, therefore, none of those ballots could legally be counted in this case. Sec. 6189, R. S. 1909 (Laws 1903, p. 170); sec. 5905, R. S. 1909; Constitution, sec. 5, art. 8; Donnell v. Lee, 101 Mo. 191. In McKay v. Minner, 154 Mo. 608, this court, construing sec. 7109 (now sec. 5904, R. S. 1909), held that section to be mandatory. In West v. Ross, 53 Mo. 350, and Ledbetter v. Hall, 62 Mo. 422, this court held that the provision of sec. 5905, that no ballot not so numbered shall be counted, is mandatory, and inasmuch as the ballot did not contain the voting numbers, the elections in those cases were held to be invalid, and resulted in throwing out the vote of each of the townships in question. No fraud was charged in either of those cases, and yet all ballots not containing the voting numbers were thrown out. Thus we have not only the express mandate of the statute supporting the proposition here contended for that the ballots cast in 1910 in the city of St. Louis should not be counted or considered in determining these cases, but we have direct precedents in the decisions of this court.

(2) The record in this case discloses that at the close of registration and revision prior to the November election, 1910, there remained on the registration books in St. Louis 170,204 votes. At the close of registration and revision prior to the municipal election in 1909 there were 150,122 votes. Thus showing an increase in round numbers of 20,000 voters in eighteen months, or practically an increase of about 100,000 inhabitants in St. Louis in that time. There was a registration in

January, 1911, prior to the charter election, and at the close of that registration and revision there remained on the books 154,950 names, thus showing a decrease in three months of about 16,000 names, or a decrease in population in St. Louis of about 80,000 inhabitants. There was another registration and revision in March, 1911, prior to the municipal election, and at the close thereof there remained on the registration books 150,916 names, or a decrease of 4,000 from January to March, 1911, and in round numbers a decrease of 20,000 registered voters between November, 1910, and March, 1911. Thus the face of the registration books show that between the registration in 1909 and the registration in 1910 there were added 20,000 names to the registration list in St. Louis, and that between the November election, 1910, and the municipal election in April, 1911, there was a decrease of substantially 20,000 names on the registration list. So that it thus appears that the registration in 1909 was substantially the same as the registration in 1911, being 150,122 in 1909 and 150,916 in 1911. Thus showing an unusual, abnormal and suspicious increase of about 20,000 names on the registration books between 1909 anl 1910, and a corresponding decrease between 1910 and 1911. The testimony in this case clearly shows that the Board of Election Commissioners, the people of St. Louis and the public press were alarmed by and suspicious of the registration prior to the election in 1910. So much was this the fact that the Board of Election Commissioners caused a canvass to be made after the close of the registration and revision in 1910 by the police force in St. Louis, which covered 149 precincts out of only eight wards and a part of the ninth ward, with the result that the police reported that they found 6909 names on the registration lists of persons who had no right to be there. Mr. Kortjohn testified that the election in 1910 was essentially a prohibition

election and that the election of candidates for political offices was lost sight of. The testimony shows that the registration of 1910 was so carelessly and negligently conducted that there were 29,427 instances in which the registering officers wholly failed to enter on the registration books their conclusions as to whether the persons registered were or were not qualified voters. In this connection it is proper to note the contention of the contestees that the signing of the registration books at the close of registration of each day by the judges and clerks of registration and the certificate at the end of each registration book as to the number of registered voters was a determination by the judges that all persons whose names appeared on the registration books unerased were qualified voters, should dispense with the necessity of entering under the column headed "Qualified Voter" whether each voter was or was not a qualified voter, is wholly untenable, for the reason that the signing by the judges of their names on the registration book at the close of each day's registration was not intended to be and does not have the legal effect of a judgment as to the qualifications of the persons whose names appear on the registration lists. Sec. 6199 provides "that at the end of the day's registration each of the said judges shall sign his name at the end of the list on each page of the registration book." The only purpose intended by the law under this provision was to prevent any one adding names to the registration books after the close of registration in the precincts, and such signing was not a determination by the judges that the person whose names appeared above their signatures were qualified voters. This is made perfectly manifest when we consider that the books are so signed by the judges at the close of each day's registration, whereas the revision of the registration lists occurs later, to-wit, on Friday of the fourth week prior to the election (Sec. 6206, R. S. 1909). It is, therefore, idle to contend that the judges

at the close of registration each day by signing the registration books have adjudicated that the persons whose names appear on the registration books above their signatures were qualified voters when they were subsequently required to revise the lists and to strike off the names found by the clerks of election on their canvass as not entitled to register. This contention of contestees is further answered by the fact that in some instances the judges of election had expressly entered their judgment that certain persons were not qualified voters. The testimony further shows that in four precincts of the Seventeenth Ward there were 10,082 negroes registered from 177 houses; that there were 1,135 negroes who registered on September 22, 1910, voted November 8, 1910, and were stricken off in January, 1911. Of these, 113 whose names appeared on the registration books and on the poll books, were not on the verification lists made by the clerks on their canvass, nor on the printed lists posted in the precincts. In addition to this there were 156 of these negroes as to whom no entry was made by the clerks on the verification lists as to whether they were found by the clerks on their canvass. In addition there were 30 of these negroes who were marked on the registration books as having voted in November, but whose names were not found on the poll books. In addition to this there were 426 of these negroes who were marked "moved" on the registration books or marked "challenged" on the verification lists, and yet the poll books show they voted at the election in 1910. In short, there were 931 of the 1,135 negroes who were shown to have either improperly registered or were not entitled to vote at the election in 1910. (3) Contestants except to the report of the commissioners that the proof adduced in this case falls short of showing that the 1,135 negroes who were registered in September, 1910, voted in November, 1910, and were stricken off in January, 1911, did not in fact exist or reside at the

places from which they registered. The commissioner did not find the facts in this regard and what is termed his finding in this respect, we respectfully submit is an unwarranted conclusion of the commissioner and is not a finding of the facts at all. The testimony adduced abundantly shows that all of these negroes registered for the first time in St. Louis in September, 1910, voted in November, 1910, and were stricken off at the day of revision in January, 1911. To offset the prima facie case thus made by contestants contestees called about 15 of the 66 negroes who appear to have been registered from houses on the south side of Clark avenue, between Sixth and Seventh streets, and immediately adjacent to the corner of Seventh and Clark avenue, and it appeared from their testimony that they were not *bona fide* residents of St. Louis, but were transients, and that the houses from which they were registered were not residences in any proper sense of the term. The contestees did not attempt to produce the balance of the challenged negro voters except in, say, a half dozen instances, but called ward, precinct or block committeemen of the Republican party who claimed to have made a canvass of their respective districts after the close of the registration or revision or before the election in 1910. Nearly all of these were negroes, and in nearly every instance when they would be asked the question whether they knew the person whose name was registered they would answer they did and that they lived at the place from which they were registered, yet on cross-examination it was developed that they did not know these people personally, had never seen them before 1910, and did not know what had become of them, and that they were not at the places from which they registered after the revision in January, 1911; that the only thing these canvassers or precinct or block committeemen knew about it was, that they had a copy of the verification lists and went to the house and asked persons who ap-

peared in answer to the doorbell whether these persons whose names appear on the verification lists lived at such houses, and were told by the person answering the bell that they did, but the canvassers could not say who the person was that answered the bell and knew nothing more about it. It further appeared affirmatively from the testimony of all these persons that these negroes were in the fullest sense of the word mere "floaters." So much so, that one of the canvassers, a white man, who said he was a doctor, testified that he practiced among the negroes, and that unless he could collect his fee within two weeks, the negroes would be gone and he would never hear from them again. These canvassers, and also the police who were called, testified that at least fifty per cent of the negroes in St. Louis changed their residence on an average of every ninety days. Nearly every one of these canvassers when asked what had become of these negroes said they did not know. Only one of the canvassers said that he could, if put to it, locate, perhaps, eight out of, say, twenty-five who were challenged in his precinct. In short, the testimony clearly shows that these 1,135 negroes were never bona fide residents of the city of St. Louis, that they were mere "floaters"; that they were not known to the more prominent and the permanent negro population of St. Louis; that they appeared for the first time in St. Louis on the registration books in September, 1910, were marked as having voted upon the registration and poll books in November, 1910, and disappeared entirely from the books and from their supposed residence or temporary abodes in January, 1911. Upon such a statement of facts as these we respectfully submit that the commissioner was in error in his conclusion and that the prima facie case made by the contestants in this respect was not overcome by any evidence adduced by contestees, but on the contrary the evidence adduced by contestees overwhelmingly established that these

negroes were not entitled to register or vote in 1910, and that their votes should not be counted in this contest. (4) The recapitulation made by the election commissioners in St. Louis of the votes for the offices in contest and certified to this court shows that Judge Brown received 79,156 votes, and that Judge Gantt received 54,365 votes. For Judge Brown in the recapitulation, the election commissioners have credited 261 votes where the ballots had two initials and no number; 320 votes where the ballots had one initial and number; 19 votes where the ballots had a number and no initial; 8 votes where the ballots had one initial and no number; and 23 votes where the ballots had no initial and no number. And for Judge Gantt said recapitulation shows he was credited with 177 ballots having two initials and no number; 153 ballots having one initial and number; 15 ballots having number and no initial; 4 ballots having one initial and no number; and 20 ballots having no initial and no number. None of these ballots should have been credited to either of these parties. As to those having no numbers there can be no question at all, for such ballots are expressly prohibited from being counted by section 5905; that is, those ballots that had no voting numbers on them and no registration numbers. They, therefore, should not have been included in this recapitulation by the election commissioners. As to those containing one initial and number or no initial and a number, whether or not they should be counted depends upon whether this court takes the view of section 5904 that was taken by Division No. 1 of this court in Hehl v. Guion, 155 Mo. 76, or the view that was taken by Division No. 2 of this court in McKay v. Minner, 154 Mo. 608. Contestants claim that the decision in McKay v. Minner should be followed, for if the provision of section 5904, that no judge of election shall deposit any ballot upon which the names or initials of the judges do not appear, is obeyed, then ballots not so indorsed with the name or initial

cannot be counted for they cannot be deposited in the ballot box, and the prohibition against depositing such ballots is as strong a negative against counting them as if it had been expressly declared that ballots upon which the names or initials of the judges do not appear should not be counted. The useful purpose intended by section 5904 was that no ballot should be deposited in the ballot box unless they had the names or initials of the two judges, presumably and practically a Democratic and Republican judge. This was to prevent stuffing the ballot boxes or substituting ballots after the close of election for those deposited by the electors. It is just as essential to honest elections that the identity of the ballot cast by the elector shall be indicated by the names or initials of two judges thereon as it is that the identity of the voter shall be identified, and it is just as essential to have the names or initials of two judges on the ballots as it is that there shall be a voting number on the ballots, for this statute was passed to prevent the representatives of either party from depositing ballots in the ballot boxes without the knowledge or consent of the representatives of the other political party. In other words this was one of the safeguards to honest elections provided by the Legislature, and its observance, as such safeguard, is much more important and much more conducive to honesty in elections than the injury which might result to the individual electors if the identity of the ballots was not thus established. This requirement was intended for the benefit of the honest voters, and has served a good purpose, in that, it has prevented officers of election from substituting other ballots for those cast by the electors, and has prevented other outside persons from substituting ballots in the ballot boxes for those that were placed there by the judges, and the benefit to the honest voters thus secured is greater than any possible injury there could be to the electors whose votes were lost in consequence of a failure of the judges

to observe these safeguards. At any rate it is apparent that this is the view that the Legislature took of this matter and the Legislature had the right to prescribe these safeguards and they should be enforced. The recapitulation sheet credits Judge Brown with 941 duplicate and triplicate ballots which had two initials and a number of them; with one ballot that had one initial and number, and credits Judge Gantt with 666 duplicate and triplicate ballots that had indorsed on them two initials and a number, and with one ballot that had one initial and number. By adding these duplicate and triplicate ballots to the votes credited to Judges Brown and Gantt respectively it is made to appear that they received more votes than they were entitled to, and the advantage of Judge Brown in this respect is made to appear to be something like 250 votes, and for the reasons already stated these duplicate and triplicate ballots should not be counted. By duplicate and triplicate ballots is meant ballots with the same voting number thereon. Whether they were cast by the same elector or by different electors and whether numbered improperly or with duplicate or triplicate numbers by the election officers does not appear, and in the absence of such showing the rule of law is that duplicate and triplicate ballots cannot be counted. (5) The record discloses that there were 725 Democratic ballots found by the election commissioners on their recount on which the name of Judge Gantt was scratched by a single stroke of the pencil and no other name inserted in lieu thereof. Contestants called 33 witnesses who testified that they voted the straight Democratic ticket and that they did not scratch the name of Judge Gantt. Contestants except to the report of the commissioner in respect to this branch of the case wherein he states a conclusion, and not the facts, that the testimony of the larger number of these witnesses was uncertain and unsatisfactory as to whether they did in fact scratch the name of

Judge Gantt. Contestants respectively contend that that conclusion is wholly unsupported by the testimony. The fact that these 725 ballots were scratched by a single stroke of the pencil, is in itself so persuasive as almost to amount to a conclusion of the fact that they were scratched by some one other than the voter himself. When voters scratch ballots they usually and naturally obliterate the name they do not intend to vote for by several strokes or heavy marks of the pencil so as to show and emphasize the intention to scratch. It must also be remembered that the recapitulation of the recount by the election commissioners in column seven thereof shows under the title "No Vote," Brown 1,452, and Gantt, 948. The evidence in this case does not show how the 1,452 "No Vote" for Brown were scratched, nor how the 948 "No Vote" for Gantt were scratched, but it does show that the 725 for Gantt were scratched by a single stroke of the pencil. Contestants did not call all of the 725 whose ballots were thus scratched, for the reason that they callel 33 of the persons whose ballots were thus scratched, and having shown by them that they did not scratch their ballots, they thereby discredited the whole 725, upon the principle of *"falsus in uno, falsus in toto,"* that is, having shown that 33 of the 725 were false, it follows that the whole 725 were likewise in the same condition. Contestants therefore claim that in the recount Judge Gantt is entitled to credit of 725 tickets or ballots which were not given to him on the recount. (6) Contestants challenge 2330 aliens who voted for contestees and who do not appear from the face of the registration books to be entitled to vote, because the registration books do not show affirmatively when, where or by what court they were naturalized. The commissioner reports that contestants challenged 2420 such aliens and that of these 2073 actually voted, and that as to the remaining 347 the registration books do not show whether they actually voted. The commis-

sioner has fallen into confusion in this matter owing to the fact that contestants read into the record the names of aliens who affirmatively appeared by the registration books to be naturalized, that is, the registration books on their face showed when, where and by what court they were naturalized. The contestants did not challenge the votes of such persons and did not show how they voted. The commissioner misapprehends the purpose of contestants in respect to these aliens. We read their names into the record for the purpose, only, of showing that on the same pages of the registration books as to certain persons the registration books showed affirmatively that a certain number were naturalized, and when, where and by what court they were naturalized, whereas, on the same pages of the registration books other aliens did not affirmatively appear from the registration books to be entitled to vote because there was no entry as to when, where or by what courts they were naturalized. Our purpose in doing this was to show that it was not the fault of the registering officers that the registration books did not affirmatively show the naturalization of the persons whom we challenged, but that presumptively the registration officers entered on the registration books all information which the applicants for registration gave the registering officers in respect to their naturalization. The commissioner states that of the aliens challenged by contestants the registration books showed under columns headed "Voted" that 2073 had actually voted and that as to 347 there was no entry in the registration books as to whether or not they voted. When it is remembered that the testimony shows that there were 29,427 names on the registration books as to which there was no entry under the column "Qualified Voter," whether or not they were qualified to vote in 1910, it is apparent that the finding of the commissioner in this respect is not very material to this case, and does not cover all of the instances in

which the registering officers failed to do their duty in
this regard. The fact is that contestants challenged
2330 aliens and showed they voted for the contestees.
Of these the contestees called as witnesses 1429. As
to the remaining 901 there was no showing other than
that made by the face of the registration books, and
that was that there was no entry whatever on the
registration books as to when, where or by what court
they were naturalized. Of the 1429 called by contestees
the evidence showed that 646 were not entitled to be
regarded as qualified voters, and these added to the
901 who were not called and who do not appear affirm-
atively on the registration books to be qualified voters,
makes a total of 1457 out of the 2330 who were not
entitled to vote, and whose votes should not be con-
sidered in this case. On the other hand contestees chal-
lenged 2363 aliens claiming that they voted for con-
testants and that they did not affirmatively appear on
the face of the registration books to be qualified voters.
The commissioner is in error in saying that the con-
testees challenged 2565 such persons, and we except to
the finding in that respect. Of these 2363 aliens chal-
lenged by contestees, contestants called as witnesses
1346. Of these 1346, the evidence shows that 175 of
them did not vote the Democratic ticket and did not
vote for Judge Gantt; that 88 voted the straight Re-
publican ticket; 24 the Socialist ticket; 3 the Prohibi-
tion ticket; 42 scratched Judge Gantt; ten voted, but
there was no ballot found in the ballot box correspond-
ing with the voting number opposite the name of the
voter on the poll book. In addition to this, of these
2363 aliens challenged by contestees, the registration
books affirmatively showed that 370 of them were duly
naturalized, that is the registration books showed on
their face the date of the papers anl the court issuing
the same, and therefore, contestants did not call them
as witnesses. The testimony further showed that as
to 175 of the 2363 aliens challenged by contestees they

had made affidavit as to their qualifications in the form prescribed by the election commissioners and stated that they had lost their papers and certified copies could not be produced in time for the registration. This left 1171 aliens challenged by contestees and called as witnesses by contestants to be accounted for, and as to these contestants showed that 1100 of them possessed all the qualifications required by law and were either naturalized themselves or their parents were naturalized, or while they were born in foreign countries they were children of naturalized or native citizens of the United States. Thus making a total of 1820 of the 2363 aliens challenged by contestee, who either did not vote for contestants or were shown to be qualified voters. Deducting these 1820 from the 2363 challenged by contestees left 543 such aliens unaccounted for and who did not affirmatively appear on the face of the registration books to be naturalized citizens. On the hearing contestants challenged the jurisdiction of the St. Louis Court of Appeals, St. Louis Criminal Court, St. Louis Court of Criminal Correction, county and probate courts in other States to issue naturalization papers. But upon further examination the contestants have determined to withdraw those challenges in respect to all except the probate courts in other States and the county courts other than California, Illinois, New York and Texas. Believing the law to be as follows: First, a court possessing appellate jurisdiction only has no power to naturalize. Ex parte Knowles, 5 Cal. 300; Ex parte McKenzie, 51 S. C. 244; Matter of Connor, 39 Cal. 98. Inasmuch as the St. Louis Court of Appeals has some original jurisdiction the rule above stated does not apply to that court. Second, probate courts having no common law jurisdiction cannot naturalize. 2 Cyc. 112, note 22. Third, the United States Naturalization Statute does not require a court to have common law jurisdiction over all subjects upon which it has

authority to adjudicate, and that it exercises its powers according to the course of the common law. 2 Cyc. 112. Fourth, in California, Illinois, New York and Texas county courts have power to naturalize. 2 Cyc. 112, note 22. As to those aliens who voted the Democratice ticket the certificate of naturalization affirmatively showed that the county court naturalizing them had common law jurisdiction and a clerk and seal. As to children born in the United States whose parents have never been naturalized the Supreme Court of the United States has held that they are citizens. United States v. Wong Kim Ark, 166 U. S. 649. Where the records of the court naturalizing have been destroyed secondary evidence is admissible. Hogan v. Kurtz, 94 U. S. 773. The general rule is that naturalization cannot be proved by parol, yet where no record can be produced, an alien possessing the qualifications to become a citizen, may be inferred to have been naturalized, from the fact that for a long time he had voted, had held office and exercised the rights and privileges of a citizen. 2 Cyc. 116, note 40. And, of course, this rule applies to children who are citizens by virtue of the inferred naturalization of their parents. (7) Contestants further claim that the placing of numbers on the ballots was unlawful and vitiates the ballots. The ballots were fastened together in one bundle by a staple or fastener, the ballot on the top being the Republican ballot and being marked at the bottom, 1, and the Democratic ballot being the next to the top and marked at the bottom, 2, etc. The purpose of a ballot is to preserve secrecy as to how the elector voted, and to prevent unpleasant consequences to the elector if it was known how he voted. By numbering the ballots in the way here done it enabled the judges and clerks to tell at a glance what ticket every elector voted without opening the ballot, by simply looking at the number at the bottom of the ballot.

*Spencer & Donnell* and *Lon O. Hocker* for contestees.

(1)    It is submitted that the case of James B. Gantt v. John C. Brown has abated by the death of Judge Gantt. "At common law there was no such proceeding as a contested election." State ex rel. v. Hough, 193 Mo. 643; State ex rel. v. Spencer, 166 Mo. 285. "An election contest under the Missouri statutes is essentially an action *inter partes.*" Sec. 5952. R. S. 1909. The judgment in an election contest, if for contestant, provides that the contestee shall "give up the office to the successful party in the contest" and shall "deliver to him all books, records, papers, property and effects pertaining to the office." It is essentially a personal contest between the contestant and contestees. Sec. 5925. R. S. 1909. Where no provision has been made by statute for the survival of a purely statutory cause of action, it follows that such statutory cause of action must abate upon the death of the plaintiff, for all special proceedings abate by the death of the petitioner or plaintiff therein unless there is a statutory provision for a survival in such action. 1 Cyc. 59; Hargett v. Parrish, 114 Ala. 515. (2)    On the threshold of each of the three cases is the question of whether or not the Supreme Court has jurisdiction to try a contested election case. Sec. 5951, R. S. 1909, expressly provides that the Supreme Court shall try contested election cases in certain instances, among which are all three of the pending election contests. Is that section constitutional? In the case of State ex rel. v. Miles, 210 Mo. 184, it was declared in an opinion concurred in by VALLIANT and GANTT, as follows: "In this State the Supreme Court has no original jurisdiction except that conferred by the Constitution to issue certain writs and the General Assembly cannot confer any other original jurisdiction on this court. The original writs mentioned in the constitution, which this court may issue

are common law writs or writs having the scope that they had at the time the Constitution was adopted. The General Assembly cannot broaden the scope of these writs so as to make this a trial court or a court of original jurisdiction of causes not contemplated in the Constitution, for example, the General Assembly has no authority to say that under a writ of mandamus or certiorari this court shall exercise original jurisdiction to try a contest election case." It would seem to irrefutably follow, therefore, that if the General Assembly cannot require the Supreme Court to try an election case under the guise of a common law writ, which common law writ is within the jurisdiction of the Supreme Court, the Assembly is powerless to require that the Supreme Court should try an election contest case as an original proceeding when an original proceeding (exclusive of the common law writs) is not within the jurisdiction of the court. Dinning v. Vail, 44 Mo. 210. Sec. 9 of art. 8 of the present Constitution is nothing more than a limitation of legislative power, and cannot be considered as an extension of judicial power, so as to remove the limitation of jurisdiction affecting the Supreme Court, as declared in section 2 of art. 6, or so as to affect the authority of Dinning v. Vail, supra. Does not a reasonable construction of these constitutional provisions with regard to the jurisdiction of the Supreme Court suggest that the exception in section 2 of article 6, namely: "Except in cases otherwise directed by the Constitution," applies only to exceptions specifically set out in section 3 of article 6? In support of Dinning v. Vail, and as well as of our contention, we respectfully refer also to State ex inf. v. Towns, 153 Mo. 106, and to the separate opinion of VALLIANT, J.. l. c. 110, 111; and also to Waite v. Railroad, 204 Mo. 504, and State ex rel. v. Flentge, 49 Mo. 488, citing the Vail case with approval. (3) Contestants claim that every ballot cast in the city of St. Louis, November 8, 1910, must be disregarded because the clerks of elec-

tion did not put a registration number thereon. This claim of contestants is based upon a mistaken understanding of the law. It is founded upon Sec. 5905, R. S. 1909, which has been on the statute books in substantially the same form at least since 1877 (p. 246, Laws 1877). This law has application to a registration number such as was formerly in use in the city of St. Louis and which so long as the law provided for a registration number was required by this section of the statute to be placed upon the ballot. In 1889 the law applicable to St. Louis provided for a registration number in that city. R. S. 1889, sec. 989. When, therefore, the law of 1889 was enacted thus providing for a registration number in the city of St. Louis, Sec. 5905, became applicable and for many years there was placed upon the back of each ballot not only the voting number, as required by the Constitution (Sec. 3, art. 8) but also the registration number as provided for by Sec. 989, R. S. 1889. In 1895 the law of 1889 was expressly repealed and a new law of registration applicable to and controlling in St. Louis was enacted. Laws 1895, Special Session, 1895, p. 5. The 1895 law made no provision whatever for any registration number. It did provide for registration and prescribed what the registration books should contain but made no provision whatever for any registration number and therefore repealed so much of what is now Sec. 5905, R. S. 1889, as required a registration number to be placed upon the back of ballots. Since 1895 there has not been any registration number required by law or used in the city of St. Louis. Every election, presidential, state, municipal, as well as elections for the various issues of bonds of the city, have all been conducted without any registration number. The election commissioners charged with the duty of holding elections in St. Louis since 1895 have uniformly construed the law to not require a registration number either on the registration books or on the ballots, and no good reason having

been shown why the construction placed upon the law by these executive officers during a continuous period of seventeen years is erroneous or harmful their construction should be adopted by this court. Ross v. Railroad, 118 Mo. 18; Westerman v. Lodge, 196 Mo. 708. This law of 1895 has been amended several times and is now superseded substantially by the law enacted in 1903, which is found in Sec. 6189, and following, R. S. 1909. The present law like the law of 1895, makes no provision whatever for a registration number. It provides clearly what the registration books shall contain. (Sec. 6198), but has no provision for any registration number. More than this, Sec. 5899, R. S. 1909, provides that "no other writing shall be on the back of the ballot except the number of the ballot voted." To hold that a registration number is necessary in the city of St. Louis would be, (a) To require an impossibility because there is no such number on the registration books and has not been since 1895. (b) To declare that not a single ballot, Democratic or Republican, or otherwise, has been legally cast or counted in the city of St. Louis for the last fifteen years, and that, therefore, not a city officer has had a single legal ballot cast for him nor has a single bonded indebtedness of the city been carried, but that every time in the last fifteen years when the citizens of St. Louis have endeavored by their votes either to elect officers or to pass upon their charter or to care for their bonded indebtedness, they have failed to cast a single legal ballot either for or against such candidates or measures. (4) Contestants discuss registrations in St. Louis prior to the election of 1910 and subsequent to the election of 1910. The history, as far as shown by the registration in St. Louis, shows conclusively that there is a large and additional registration whenever there are candidates to be elected in whom the people are particularly interested, or when there are subjects to be voted upon which

244 Mo. Sup.—19

especially concern the people. In 1908 the registration was nearly twenty-five thousand larger, preceding the vote for Governor, than it was in the year of 1907, preceding the vote for councilmen, and in 1910, when prohibition was the live question in the State, the registration was a little over twenty thousand larger than was the registration in 1909, when only the vote for city officers was to be taken. It is undoubtedly true that on the registration books in 1910 there were a number of thousands of names which ought to have been stricken from the registration books. That they were not so stricken, the evidence has abundantly shown, was because the time required by law for the canvassing and revision of names and the inclemency of the weather during the single day of revision made it physically impossible to accurately revise the registration books, so that on November 8, 1910, when the election in question took place, there were upon the registration books in St. Louis several thousands of names of persons who had moved or who were dead, or who had left the city and which properly should have been stricken from the registration books; but that this did not in the least affect the integrity of the vote is shown conclusively by the fact that the vote in St. Louis in 1910 for Supreme Judge was 143,414, while the vote two years before for Governor was 140,803, which provides for only a normal increase in the city. It is also undoubtedly true that in the two registration books for each of the 403 election precincts in St. Louis there were many mistakes and omissions and inaccuracies. It will always be so, so long as the election officials are required to serve without practically any previous experience and are so limited in time and so overwhelmed with the large number of citizens in the precincts entitled to registration that all the election officials can do is to make as accurate and full a compliance with the clerical details of registration as is possible. Hehl v. Guino, 155 Mo. 81. Some of

Gantt v. Brown.

the registration books were found to be better kept than others. Some of them had comparatively few omissions or mistakes; others had comparatively many omissions and mistakes. The testimony of all the judges and clerks, both Democratic and Republican, and all the written evidence in the case fails to show even an indication of any fraudulent or dishonest conduct on the part of the election officials at either registration or election. (5) The commissioner has found in regard to the whole negro question that the evidence was insufficient to show that "these colored voters did not in fact exist or did not reside at the places from which they registered." If the same contentions as are here seriously made by contestants against negro voters were ever even intimated against white men, it would result in such ridicule or indignation as would instantly sweep them from consideration. It is seriously contended that negroes who registered in September, 1910, and who voted November, 1910, and who were stricken off from the registration books in January, 1911, are to be disfranchised. Exactly the same state of facts is true of thousands of other citizens of St. Louis. Every man who registered in 1910, who voted in the November election of 1910, and who subsequently moved, changed his residence or left the city prior to the revision of January, 1911, is in exactly the same position, and the number of white men of whom these facts are true is greater in the aggregate than the number of colored men of whom it is alleged, and yet contestants have sought through the whole of the city of St. Louis for individual instances of negroes who, because they had moved or changed their residence or for some other reason, were erased from the registration books in January, 1911, in order that they might thus challenge their right to vote in November, 1910. In whole precincts they were able to find but a single negro subject to this charge, as, for example, but one in the first precinct of the Twenty-eighth Ward, but in the sixth

precinct of the Twenty-eighth Ward, but one in the tenth precinct of the Twenty-sixth Ward and so on, as heretofore shown in a large number of cases. Where this challenge of contestants applied to districts in which a large number of negroes lived, the contestees, not because there was any merit in the charge of contestants, but in order to more abundantly show the fairness which they believe characterized the election of 1910 produced a large number of witnesses to show that the registration of the negro voters in these congested localities was fair. Why is it, if there was any actual wrong or fraud or "colonization," that contestants were unable to produce a single witness to establish any such specific wrongdoing? There were Democratic judges and clerks in every precinct of the city; there were Democratic challengers; there were Democratic precinct committeemen and city committeemen, and if there was any of the fraud which contestants have so vehemently charged and so completely failed to prove, there must have been some evidence obtainable to sustain it. Windes v. Nelson, 159 Mo. 75. (6) It is submitted that the court should decide the following question about which there is doubt, namely, as to whether ballots which are duly numbered and concerning which there is no evidence of fraud, should be thrown out because two judges of election have failed to place their initials thereon, or because only no judge of election has placed his initials thereon. It will not seriously affect the pending cases, but the law in this State as indicated by McKay v. Minner and Heihl v. Guion, is on this question in direct conflict. It is submitted that there can be no question that in the recount of the ballots those ballots which are marked duplicate, that is, the ballots on which the same number appears, on two of them, but which are regularly initialed and are numbered and found in the ballot boxes, should be counted. The duplication of numbers is but a clerical mistake, as has been heretofore shown, which does not in the

least affect the validity of the ballot. They were counted in the original returns and they are counted in the recount for the candidates for whom they are cast. There is not a line of testimony to show that there was any fraud, intentional or otherwise, in connection with these ballots. All that is shown is that when the ballots were examined in the ballot boxes it was sometimes found, on an average of about four ballots to a precinct, that two ballots would have the same number and that there would be a corresponding omission of number, that is, if two ballots were numbered ten, there would be found no ballot numbered either nine or eleven. In some cases the poll books would show two men with the same number, in which event, if two men were, for example, numbered ten, there would be no number nine or no number eleven on the poll book, as the case might be. These are the incidental mistakes of election in a large city which, in the absence of some showing of fraud or intention to be dishonest, ought in no event to interfere with the franchise of the elector. In these pending cases there has not been shown a single voter who was entitled to have his vote cast, whose vote was disregarded, or a single person who was intentionally allowed to cast his illegal ballot. It would indeed be unfortunate if technical and natural and unpreventable mistakes of election officials who were endeavoring to do the best they could, as the uncontradicted evidence shows was the case with the election officials of the city of St. Louis at the 1910 election, should disfranchise electors who were unconscious of the clerical mistakes, and who, for every reason of public policy, ought not to be so disfranchised. (7) The position of contestees with regard to the 688 ballots from which the name of Judge GANTT was scratched, is based upon the assumption that somewhere, some time, some election official fraudulently, dishonestly and criminally tampered with these ballots and scratched the name of Judge GANTT. There is not

a word of testimony as to how, when, where or by whom, this was done. The evidence shows that more ballots, under exactly similar circumstances, and in exactly the same manner, had the name of Judge BROWN scratched. The presumption of law is that where the conduct of an individual or public officer can be as well ascribed to honesty as to dishonesty, he will be presumed to have done his duty and not to have committed a crime. Dallam v. Renshaw, 26 Mo. 533; Lumber Co. v. Crommer, 202 Mo. 521; Glover v. Ins. Co., 130 Mo. 173. (8) The commissioner has rightly found that substantially the same number of Democratic foreign born voters were challenged by contestees as was the number of Republican foreign born voters challenged by contestants, and that substantially the same number of each of these challenged classes was produced and either showed their naturalization papers or made explanations which were substantially the same in character and the same in number on both sides. The fundamental question back of them both is this: Does the failure of clerks of election to properly enter on the registration books all the facts called for by such registration books constitute evidence sufficient in itself to discredit the vote of the person whose registration is not thus complete on the registration book? Expressed in other words, is it true that clerical mistakes or omissions on the registration books by clerks of election are sufficient to presumptively disfranchise the elector whose registration on the books is not thus complete? Contestees contend that when the judges of election in a given precinct before whom an applicant for registration (who is foreign born) appears, have heard his testimony whether it consists in the production of his naturalization papers, which are undoubtedly the best evidence of his naturalization, or whether it consists in the production of his father's papers, and the establishing by him of the fact that he was a minor when his father was naturalized, or whether it con-

sists in any other evidence that, satisfied the judges of election that the applicant, being foreign born, is entitled to registration and the judges of election enroll his name on the registration books as a qualified voter, such decision of the judges of election presumptively entitles that applicant to register and to vote, and his vote cannot be challenged except by some showing on the part of him who makes the challenge. Gumm v. Hubbard, 97 Mo. 320. The mere fact that the clerk of election whose duty it is to fill out all the blanks provided on the registration books does not fully perform his duty cannot disfranchise the voter. Quinn v. Lattamore, 120 N. C. 434; Paine on Elections, secs. 360, 361; Saunders v. Lacks, 142 Mo. 263; McCrary on Elections, sec. 140. It should be remembered that with regard to foreign born voters, there is nothing in the law applicable to St. Louis that requires a naturalized citizen to produce his naturalization papers. Undoubtedly it is the easiest method of proving his naturalization, but all that the law requires is that a majority of the judges shall be satisfied from what the applicant produces by written or other evidence that he is entitled to register, and if the judges believe him to be thus entitled to register their judgment is good until there is some actual evidence upon the part of whoever may challenge their judgment to show that it was wrong. The fact that the judges of election have deemed the man entitled to register and vote is shown not only by a complete filling out of all the blanks on the registration book as contestants contend, but by the filling out of certain individual blanks and by other evidences of the judgment of the judges that he was qualified, as, for example: (a) By the certificate of the judges of election at the close of registration. (b) By entering a date under the column in the registration books headed "Date of Application," for this fact indicates that the "applicant presented himself and was adjudged a qualified voter in the election pre-

cinct." Sec. 6198, R. S. 1909. (c) By the publication of the list of names on the registration books, which publication, according to the language of the statute, shows the "names of qualified voters alphabetically arranged as they appear upon the registration books." Par. 3, sec. 6191, R. S. 1909. (b) By allowing the name of the voter to remain upon the books unerased. R. S. 1909, sec. 6206. All the foreign born voters read into the record by the contestants were qualified voters. The only purpose of contestants in bringing in 1359 of them to actually produce their naturalization papers or to explain their right to registration was merely to show how absolutely without foundation was the charge that they were not qualified voters.

GRAVES, J.—Contestant and contestee were opposing candidates for the office of Judge of the Supreme Court of Missouri at the general election held in November, 1910. The proceeding was brought in this court under the statute which so authorizes such action. The petition and the answer need not be set out, either in full or in substance, for the questions now left in the case. Suffice it to say that issues of fraud and illegal voting were made by the pleadings. In the answer, and otherwise by motion, the jurisdiction of this court is challenged by contestee, and was so challenged from the beginning. Throughout the question has been urged and is now pressed.

By proper order a commissioner was appointed to take testimony and report to this court. Also by proper order a recount of the votes in the city of St. Louis and St. Louis county was ordered, and the result of such recount together with the result of a comparison of the ballots with the poll books has been certified to this court by the election commissioners of the city of St. Louis, and the county clerk of St. Louis county. The evidence was taken and certified to this court by our commissioner, who also re-

ported thereon his findings of fact for our information, as he was by our order directed to do. In this state of the case the contestant died, and his death was suggested to the court. Contestee then and before the argument of the case filed his motion to abate the case, which motion we took with the case. In the view we have of the law, there are but two questions we need discuss, and these refer in *no* wise to the merits of the controversy. The questions are, (1) have we jurisdiction and (2) if so does the suit abate? Of these in their order.

I. Has this court jurisdiction of the cause? If not, nothing further need be said. We are of opinion that we have jurisdiction. This conclusion we reach from our present constitutional provisions, when interpreted in the light of their birth, growth and development. By the original Constitution of 1820 the judges of this court were appointed by the Governor, *vide,* section 13, art. 5, of said Constitution. In this state of the case there was no election and hence no provision for a contest. Later, however, in 1850, the scheme was changed, and by section 12, art. 6, of the amendments of the said Constitution, such officers were made elective. By the same section it was provided "and in case of a tie, *or a contested election,* between the candidates, the same shall be determined in the manner to be prescribed by law." The italics are ours. Pursuant to this constitutional provision we had section 77 of chapter 59, Revised Statutes 1855, p. 709, which reads thus: "All contested elections for Judge of the Supreme Court, Superintendent of Common Schools, Secretary of State, Auditor of Public Accounts, State Treasurer, Attorney-General, or Register of Lands, shall be decided by vote of the Senate."

This remained the scheme and the law until the adoption of the Constitution of 1875. Section 9 of article 8 of that Constitution reads:

"The trial and determination of contested elections of all public officers, whether State, judicial, municipal or local, except Governor and Lieutenant-Governor, shall be by the courts of law, or by one or more of the judges thereof. The General Assembly shall, by general law, designate the court or judge by whom the several classes of election contests shall be tried, and regulate the manner of trial and all matters incident thereto; but no such law, assigning jurisdiction or regulating its exercises, shall apply to any contest arising out of any election held before said law shall take effect."

Note the difference. The amendment to the Constitution in 1850, left it to the General Assembly to designate the body or forum before which the contest should be determined, and the General Assembly fixed the State Senate as the forum. In 1875, however, the constitutional provision took away a part of the legislative discretion, and said all contested election cases except Governor and Lieutenant-Governor must be determined "by the courts of law, or by one or more of the judges thereof." This Constitution, however, left to the General Assembly the right to designate the particular court of law, which should determine the particular case, or rather class of cases. We have here specific constitutional power generally conferred upon all courts of law in this State to determine contested election cases. The term "courts of law" as used in this section includes the Supreme Court. To my mind there is in this section the general grant of power to this and other courts of law to try such cases, and if in the mind of the General Assembly it was thought best to assign any class of election contest cases to this court, the power to hear and determine would have constitutional sanction. In 1877, two years later, and at a time when the constitutional provision, supra, was yet fresh in the minds of the people, the General Assembly amended the old law as to the forum where

such contests should be heard, and made such statute to read:

"All contested elections for Judge of the Supreme Court, Superintendent of Public Schools, Secretary of State, State Auditor, State Treasurer, Attorney-General or Register of Lands, shall be heard and determined by the Supreme Court or any three judges thereof, in vacation: *Provided,* That no judge of said court who is a contestant or contestee in such election shall be permitted to hear and determine the same." [*Vide,* Laws 1877, p. 248.] The law as thus amended in substance remains with us to-day. [Sec. 5951, R. S. 1909.]

When the General Assembly thus assigned this class of cases to this court by legislative act, it amounted to a legislative construction of the meaning of section 9, article 8 of the Constitution of 1875. When the Governor signed such bill, thus making it a law, it amounted to an executive construction of the same constitutional provision. This legislative and executive construction is (as evidenced by their acts) that constitutional power was given this court to try such a case as we now have before us, by the provision of the Constitution, supra. In other words the Legislature construed the Constitution to mean that this court had the power to determine the case, if that body saw fit to burden the court with such cases. Legislative constructions are not binding upon the courts, but they are at least persuasive, and especially so when they occur so soon after the adoption of the instrument. At such time the discussion of the several constitutional provisions was fresh in mind. The reasons for changing the forum from the Senate to the courts were fresh in mind. The construction made at such time is more valuable as an aid to the courts. We are disposed to take the view that the legislative construction then given is the proper one.

Sections 2 and 3 of article 6, of the same Constitution read:

"Sec. 2. The Supreme Court, except in cases otherwise directed by this Constitution, shall have appellate jurisdiction only, which shall be coextensive with the State, under the restrictions and limitations in this Constitution provided.

"Sec. 3. The Supreme Court shall have a general superintending control over all inferior courts. It shall have power to issue writs of *habeas corpus,* mandamus, *quo warranto, certiorari* and other original remedial writs, and to hear and determine the same."

It is argued by contestee that under these sections our jurisdiction is purely appellate, except in *"habeas corpus,* mandamus, *quo warranto, certiorari* and other original remedial writs." To this we do not agree. Section 2, quoted supra, says our jurisdiction is appellate only, "except in cases otherwise directed by this Constitution." If we had no section 3, as quoted above, we would have no original jurisdiction in cases of the original writs mentioned therein. But by section 3, supra, it is "otherwise directed by this Constitution" that we have original jurisdiction in the cases mentioned in said section 3. But section 3, supra, is not the only place in "this Constitution" where it has been "otherwise directed by this Constitution" as to our original jurisdiction. We have an "otherwise direction" in section 9 of article 8, which gives this court, among other courts of law in this State, the right to hear and determine such election contest cases as we have before us now. To my mind section 9 of article 8 is as much an "otherwise direction" in the Constitution as is section 3 of article 6. Section 9 confers original jurisdiction in one class of cases, whilst section 3 confers original jurisdiction in other classes, but they each confer original jurisdiction. They each modify the broad limitation found in section 2 of article 6, and the one as effectively modifies as does the other. We are

cited to the case of Vail v. Dinning, 44 Mo. 210, as ruling *contra*. The ruling in that case was well made. This case was prior to the Constitution of 1875, and at a time when there was no express constitutional provision empowering "the courts of law" in this State to determine contest cases.

To my mind the provisions of section 9 of article 8 of the Constitution of 1875, were suggested by the opinion in the Vail-Dinning case, supra. The construction given this section of the Constitution so soon thereafter by the Legislature strongly so indicates. We therefore rule that we have jurisdiction in this class of cases.

II. Does the admitted death of Judge GANTT abate this action? We think so. We have no statute in Missouri providing for the survival of such an action. The very nature of the office contested makes the action purely personal. The duties of such an office are such that they must be performed by the holder thereof and can not be delegated to another. In other words, the duties must be personally performed and are nondelegable. These things impress the suit as being one purely personal in character. No one has any interest in the office except the contending parties. Salary is a mere incident to the office. [State ex rel. Evans v. Gordon, 245 Mo. 12.] And salary is not in a legal sense involved in this case. Salary might follow as a result of the case, and purely as an incident to the office, but not by force of the judgment itself to be rendered in this case. That judgment is fully bounded by the terms of our statute. [Sec. 5925, R. S. 1909.] And it should also be remembered that in the United States the right to hold office is not a property right in the same sense as personal or real property. It is in no sense an incorporeal hereditament, as in some English offices. [Throop on Public Officers, chap. 2, sec. 16 *et seq.*]

In this country the right to hold office is purely statutory, and unless forbidden by constitutional edict, can be given and taken by the legislative will. Being purely statutory the modes and manner of acquiring it are likewise purely statutory, and it is to the statutes that we must go to determine a case of this character. However, the common law as to abatement may shed light. The common law rule is thus tersely stated in 1 Cyc., p. 47: "At common law a suit abated by the death of a party before trial or verdict. If the cause of action was one that did not survive, death put a final end to the suit. If the cause was one that survived or could survive, plaintiff or his personal representative was obliged to bring a new action against defendant or his personal representative."

This strict common law rule has been modified by statutes in the States generally, and provisions have been made for the revival of the pending action in the name of the parties having the right, by survivor, to further prosecute the case. These statutes obviate the necessity of bringing a new suit by those to whom the action survived. Then we have statutes which make certain actions survive, which at the common law did not survive the death of the party. But as stated we have no statute in this State providing for the survival of an action like the one at bar. Nor is it an action which at common law survived.

Let us test this case by the general rule. In 1 Cyc., p., 49, it is said: "As a general test an executor or administrator cannot come in and prosecute a suit unless he was in a condition to commence a like suit if it had not been begun by his testator or intestate. At common law, as a general rule, the qualities of assignability and survival are tests each of the other and are convertible terms." Applying these tests to the case at bar it is clear that it must abate. Had Judge GANTT died ten days after the election in 1910 and without bringing this action, was there any one who could have

brought it for him? The answer must be in the negative. If not there is no one who can be substituted for him now for the further prosecution of the case. And if we apply the common law test of assignability we come out at the same point. There are some cases that the very nature of the case makes death the end of the case and this is one of them. For instance in a divorce proceeding death of necessity determines the case. In such case as to the marital relation death accomplishes just what the party sought, i. e., a dissolution of the marriage relation. So in the case at bar. Here the contestant sought the right to exercise the rights and privileges of a judge of this court. Such could not be exercised for him by another, so that death of necessity put an end to his ambitions in this direction. The case might be likened to a dowress, who in life sues for the admeasurement of her estate. If such dowress die, the further prosecution of such suit would be useless, because with her death was the death or falling in of her estate. So here the grim reaper has destroyed the power of contestant to occupy the office, and to enjoy the privileges, powers, duties and emoluments thereof. This to my mind is the reason of the situation. But going to our statutes we have a further and conclusive reason. As above indicated we have a statute which prescribes the judgment to be rendered in such a case. Section 5925, Revised Statutes 1909, reads:

"In every case of a pending contested election, the person holding the certificate of election may give bond, qualify and take the office at the time specified by law, and exercise the duties thereof until the contest shall be decided; and if the contest is decided against him, the court or other tribunal deciding the same shall make an order for him to give up the office to the successful party in the contest, and deliver to him all books, records, papers, property and effects pertaining

to the office, and may enforce such order by attachment or other proper legal process.''

Such is the only judgment provided for by the law in cases of contest. It is not like a judgment in a *quo warranto* proceeding. It is a judgment peculiar to contest cases, and for the very good reason that such cases are in an independent class unto themselves. Death as fully precludes the entering of the judgment provided for in this statute as it precludes the admeasurement of the widow's dower estate after her death. The statutory order we make, is that contestee surrender the office to contestant, and deliver to contestant all the paraphernalia of the office. ·Death of the contestant forbids such an order or judgment, and as the action is one purely statutory and as there is no statutory provision for a different judgment, the case *ex necessitate* abates.

The views we have expressed find full support in the case of Hargett v. Parrish, 114 Ala. 515. In that case Hargett contested the election of Parrish and was unsuccessful below. He appealed and pending the appeal Parrish died and the Governor appointed one Hall to succeed Parrish as sheriff. Motion was made to revive the case as against Hall, the successor of Parrish. In that State there was a statute providing that the death of contestant should not abate the suit, but the statute was silent as to the death of the contestee. Discussing the case, McClellan, J., said:

''The proceeding being purely statutory, no pretense that there could be such revivor or substitution at common law being made, the order sought must find statutory authorization, or it cannot be granted. The statute providing for the contest itself provides that a contest does not abate by the death of the contestant, but contains no provision in respect of the death of the contestee.

''Section 2600 of the Code provides that 'all actions on contracts, express or implied, all personal

actions, except for injuries to the person or reputation, survive in favor of or against the personal representatives.' The present is not an action within the meaning of that section; and if it were, Hall is not the personal representative of the deceased Parrish.

"Section 2603 of the Code is as follows: 'No action abates by the death or other disability of the plaintiff or defendant, if the cause of action survive or continue; but the same must, on motion, within eighteen months thereafter, be revived in the name of or against the legal representative of the deceased, his successor, or party in interest; or the death of such party may be suggested upon the record, and the action proceed in the name of or against the survivor.' The contest of an election is not within this section, since it applies only to cases in which the cause of action survives, and the cause of action involved in such contest does not survive at common law, nor is it within either of the sections 2600, 2601 or 2602, which undertakes to declare what causes of action do survive, and all that survive, the death of parties; nor does the cause by the terms of the contest statute survive the death of the contestee, as we have seen.

"Having reference to mandamus, prohibition, *certiorari* and other remedial writs of a supervisory nature, section 3162 of the Code provides: 'If any officer against whom such proceedings are had should die, or otherwise vacate his office, while the same are pending, whether on appeal or otherwise, the same may be revived against his successor in office, in the manner in this chapter provided.' The contestation of an election obviously is not a proceeding for mandamus, prohibition, *certiorari,* or other writ of a supervisory nature; it involves the issuance of no writ supervisory of the official acts of officers, to which alone the section last quoted has relation, and is not in form or substance supervisory of the action of any

officer or officers; but is a mere adversary trial of the right of office between two parties, each of whom claims to have been elected thereto.

"No other statute has been called to our attention, or exists which bears at all upon the question. As neither the common law nor any statute authorizes revivor against or the substitution of the name of Hall, as appellee in the case, the motion to that end must be denied."

We have quoted at length from this opinion, because the statutes discussed are largely covering grounds covered by Missouri statutes. In Missouri, however, our contest statute makes no provision whatever for a revivor, and in that respect is stronger against the claims of contestant's counsel in this case than is the Alabama statute. Distinguished counsel for contestant urges a number of cases in support of his claim of survivor, which to my mind are not in point, but which we discuss next.

III. It is contended by the learned counsel who represented contestant in his lifetime, that contested election cases do not abate because the public has an interest in such cases. Counsel are not without what would at first glance appear to be authority for the position. They rely upon section 454 of McCrary on Elections (4 Ed.) and 7 Ency. Pl. & Prac., p. 393, and the cases supporting these texts.

Section 454 of McCrary, reads: "A contested election case, whatever the form of the proceeding may be, is in its essence a proceeding in which the people— the constituency—are primarily and principally interested. It is not a suit for the adjudication and settlement of private rights simply. It follows that the parties to the record cannot, by stipulation or otherwise, discontinue or compromise a case of this character without the consent and approval of the court or tribunal trying it. Nor could such consent ever be

given, unless the court giving it is sufficiently advised to be able to say that it is for the interest of the public to do so."

And 7 Ency. Pl. & Prac., p. 395 reads: "As a general rule it is apprehended that a contest once instituted cannot be discontinued by the contestant or petitioners, as the people have an interest in the result."

At first blush it would appear that these texts would settle the question adverse to the claim of contestee and in favor of the position of contestant's counsel. But unfortunately for jurisprudence the later day textbooks are written from precedents rather than from principles, and the precedents are too often misconceived. God speed the day when the giants of the law will write a few texts covering principles, rather than misapplied precedents. The cases cited by the authors in support of these texts above quoted do not support the broad doctrine in such texts announced. What is said in the cases which in any way support the text was said in reference to peculiar statutory provisions, which made the language of the opinion justifiable in the case then in hand, but furnish no basis for the broad pronouncements of these text-writers. A review of these cases should be made in the interest of jurisprudence. We shall review those cited in support of section 454 of McCrary on Elections [4 Ed.] only, because the same line of cases furnishes the basis for the other author. McCrary cites Mann v. Cassidy, 1 Brewst. 43; People v. Holden, 28 Cal. 139; Kneass's Case, 2 Pars. (Pa.), 570; and Collings's Case, Bright. Elec. Cases, 513. In the case of Mann v. Cassidy, 1 Brewster, 11, the judges of the court of common pleas of the first judicial district of Pennsylvania (Philadelphia) did use this language:

"But we are in no doubt as to the impropriety of recognizing the 'discontinuance' offered, as the case now stands. Mr. Mann became a party to this pro-

ceeding. He undertook to prove that great frauds had been perpetrated at the October election, and the language used by his counsel, Mr. Read, is that 'the whole evidence exhibits the most palpable frauds on the ballot box.'

"He claims thus to have established much that he alleged to exist; and yet, because by an act of Assembly, which his counsel declares has given him all he claimed, he is relieved from any further personal interest in the case, and has publicly withdrawn from it, it is asserted that by his simple 'discontinuance' he can relieve the court from all further duty of determining whether those 'most palpable frauds' have had any effect on the validity of the election. Certainly none would more truly rejoice to be relieved from the further consideration of this case than the court before whom it has 'dragged its slow length along;' but that relief can only be obtained by the conscientious discharge of the duty imposed upon us, not by avoiding it. If frauds have been proved, how can we omit to examine into their effect? Why was the court applied to? Not, certainly, to ascertain only Mr. Mann's right to the office, for which Mr. Cassidy held the return. For this purpose the law has provided a writ of *quo warranto.* This is not such a proceeding. The question here is, not between two individuals only, but it is whether the voice of the people had been falsely and fraudulently misrepresented. It is a public question, not, as the counsel for Mr. Mann stated they considered it, that of a private individual contesting the seat for a public office. While, then, we cannot prevent the party who is satisfied from leaving the case, we cannot recognize any right or power remaining in him, after his departure, to further interfere in the case. He came in voluntarily, and he departs without hindrance. We think his power over the case departed with him. The discontinuance, therefore, cannot be recognized."

This is the basis for the text quoted from Mc-Crary, and the court above mentioned is the authority. But let us go to the facts of the case. Mann and Cassidy were opposing candidates for district attorney, and Cassidy on the returns won. Under the statutes of Pennsylvania authorizing the proceeding twelve electors of the district brought the proceeding charging that Cassidy had been fraudulently returned as duly elected district attorney. Mann was not one of the electors so proceeding. Upon the record he was not a party to the suit, but by his counsel he did participate in the taking of testimony. After the testimony was all taken, Mann, who was not a party of record in the case, moved its discontinuance. It was upon this motion that the language above quoted was uttered. It may be, inasmuch as the statute of that State authorized electors or voters to challenge the validity of the election, that in that way the case became one between the public and the contestee, and the language of the case be thus fully justified, but it is not authority for the broad rule announced in McCrary. Nor is the case authority in this State, where a contested election case is one *inter partes*. It would be strange doctrine to Missouri to say that under our statutes the contestant cannot dismiss his case at any time before final submission.

The next case relied upon by the text is People ex rel. Budd v. Holden, 28 Cal. 123. Let us go to the facts. The contest was over the office of county judge. Budd and Holden were opposing candidates. Budd claimed to have been elected, but Holden was returned as elected. Budd complained to the Attorney-General, who in the name of the people, i. e., the State, instituted the proceeding. Holden was ousted by the court *nisi*, and appealed. We have carefully searched the opinion in this case for support of the doctrine announced by McCrary. The only thing we find is this:

"It is first claimed by the appellant that the district court had no jurisdiction in the premises, and that the only remedy in cases like the present is under the statute which prescribes the mode and manner of contesting elections. [Wood's Digest, p. 380, sec. 51.] No proposition could be more untenable. It is true that the act providing the mode of contesting elections confers upon any elector of the proper county the right to contest, at his option, the election of any person who has been declared duly elected to a public office, to be exercised in and for such county. But this grant of power to the electors can in no way impair the right of the people, in their sovereign capacity, to inquire into the authority by which any person assumes to exercise the functions of a public office or franchise, and to remove him therefrom if it be made to appear that he is a usurper having no legal title thereto. The two remedies are distinct, the one belonging to the elector in his individual capacity as a power granted, and the other to the people in the right of their sovereignty. Title to office comes from the will of the people as expressed through the ballot box, and they have a prerogative right to enforce their will when it has been so expressed by excluding usurpers and putting in power such as have been chosen by themselves. To that end they have authorized an action to be brought in the name of the Attorney-General, either upon his own suggestion or upon the complaint of a private party against any person who usurps, intrudes into, or unlawfully holds or exercises any public office, civil or military, or any franchise within this State. It matters not upon what number of individual persons a right analogous in its results when exercised may have been bestowed, for the power in question none the less remains in the people in their sovereign capacity. It has been shared with the elector, but not parted with altogether. Substantially the same point was

made in the case of People v. Jones, 20 Cal. 50, without success.''

During the trial in the lower court some stipulations seem to have been entered into, and in discussing them the court further said: ''Moreover, it is very doubtful whether these stipulations were ever binding upon the people, who were the real plaintiffs in the case. They were not made by the Attorney-General by whom the suit was instituted, but only by the private counsel of the relator. Theoretically the people alone are interested in the determination of the controversy involved in this case, and no court would be justified in enforcing as against them a stipulation made by the relator or his counsel to their prejudice. The action is in no legal sense under the control of the relator. It was brought in the name of the people and to enforce their will as expressed through the ballot box and not merely to redress the wrongs or enforce the rights of the relator. [Searcy v. Grow, 15 Cal. 119.]''

Not a thing else in this opinion aims at the doctrine announced in the text. What the California court did hold is that the particular case was one in the name of the people, and the people or State were not bound by a stipulation not signed by their representative, the Attorney-General. The opinion further indicates that such contests can be maintained in two ways (1) by an elector, and (2) by the State through the Attorney-General, and further that if by the Attorney-General, it is yet an action by the State, although upon the information of an individual. It is clear that this case does not support the text in either book cited.

We next reach Kneass's Case, 2 Parsons, 559. This case comes from the Philadelphia court, as did the case of Mann v. Cassidy, supra. Like the Mann case it is a contest over the office of district attorney. Under the Pennsylvania law in force at the time, as indicated by the opinion, it was provided that an election might

be contested by not less than twenty electors. In Kneass's Case it is said that thirty-one instituted the proceeding. The big fight in the case was over amending the petition, and what was said was upon this matter. The court itself at page 571, thus states the matter for decision: "Two questions then arise for deliberate consideration. First. Will the court ever allow a petition in the case of a contested election to be amended? Second. Is the amendment now asked one that can be permitted by any established rules of law?"

The court goes into the case law as to amendments, and does use this language:

"Cases of this sort are more like the one under consideration than, perhaps, of any other kind. With these conclusive authorities, and many more which might be cited to the same point, if they are to have the least influence upon the judicial mind, I do not see how the present amendment can be refused, if we adhere to our previous ruling, that we will liken these petitions to other legal proceedings.

"But in my opinion there is another ground on which the present application should be allowed, still stronger if possible. There are a number of specifications in which there is a direct charge of fraud, which if sustained by proof, are of the most flagrant kind; and had the petitioners averred that these alleged fraudulent acts would have changed the result, and how it would.be changed, it must be admitted this court would have had no hesitation in at once directing the proof to be taken. So soon as this omission is pointed out, the contestants propose to insert all in their petition which the respondent requires, to make it proper that an inquiry should be had. *Therefore in our opinion, we ought now to permit the petition to be amended. The cause of public justice demands it. It is due to the people of the county, and it is due to the gentleman who holds the certificate; for I am sure he, nor no* other high-minded, honorable man, would wish to hold

an office so important, except by the suffrages of a majority of the people, truly and fairly expressed. And we should do an injury to Mr. Kneass, as *well as to the cause of public justice, if, in the exercise of a sound discretion, we refuse to open the doors of a judicial tribunal for a full inquiry into charges so grave as those alleged in this petition, if it can be done consistently with the rules of law, and the practice in legal proceedings.* That it can be, I think, has been abundantly shown by authority.''

We have underlined the only things giving color to the broad rule announced by McCrary. Further discussing this matter of amendment in Kneass's Case, at p. 576 the court said:

''It has been contended that the amendment in the form now offered cannot be allowed, inasmuch as there are more than thirty citizens who signed the original petition, and only twenty-one of them have signed a petition for the present amendment, although verified by the same persons who made the affidavit to the original petition.

''This objection on no sound principle can be sustained. Suppose an election has been carried by the most abominable fraud—the act requires there should be twenty citizens of the county to sign a petition for the contest. Ten of those who were concerned in the fraud might unite with ten innocent individuals in the contest, and then appear and ask to withdraw, or to refuse to unite in an amendment clearly admissible, and thereby conceal the very fraud they had concocted and perpetrated. I concur with Judge WOODWARD in his able opinion, found in the 3d vol., L. J. 160, that the jurisdiction of the court had attached from the moment the petition was filed, and a few individuals, by withdrawing, should not shut out all inquiry. Here the number have signed the petition to amend, which is required by the act; which is a sufficient answer to the objection; and even if they had not, we should never

suffer the course of public justice to be obstructed, because some choose to withdraw. Therefore, in our opinion, the amendment proposed should be filed, and be considered as forming a part of the original petition for the purpose of a future investigation of the case; and, therefore, the motion to quash is overruled, and testimony ordered to be-taken, and to be confined to those specifications which are not ordered to be stricken out, as indicated at the commencement of this opinion.''

We have above quoted every vestige of the opinion bearing upon the rule under discussion. That it does not bear out the rule is evident. In this, like the Mann case, it must be borne in mind that the proceeding is one by electors, who in a sense might be said to be the public.

Lastly we are cited to Collings's Case, Brightly's Leading Cases on Election, p. 503. The opinion is from another of the common pleas courts of Pennsylvania. The case stated is this: ''This was a petition contesting the election of E. B. Collins to the office of clerk of the courts of Luzerne county, to which he had been returned as duly elected at the general election held on the 8th of October, 1861. The petition was filed on the 16th of November; and the respondent moved to quash, on the ground that the petition had not been filed within ten days after the election, as required by law.''

At page 513 the court used the language: ''We repeat, that in no part of the act, relating to an office such as the present, is the defeated candidate looked upon as a party, or as liable, in any event, to costs, unless voluntarily assumed; the petitioners are complaining voters, acting in the pursuit of their own rights, for the honest purpose of purifying the ballot box from fraud, are alone looked to as contestants, and in no event alone liable to costs. It is not regarded as the complaint of the candidate; he cannot be per-

mitted to withdraw or in any way to control it. If the alleged fraud, upon being proved, would apparently change the result of the election, unless the people represented by the petitioners agree to it, an arrangement made between the different candidates, could not be used to defeat the contest; it may be abandoned and withdrawn, if no one will come forward to prosecute it, but the candidate cannot so control it. It is not the right of the individual alone who may be interested in the office, to defeat or set aside a fraudulent election; in him there may be a personal or pecuniary interest, but with the people there remains a public or moral right to act."

The judge made an extended argument trying to show that the "ten days" mentioned in the statute meant ten days from the day of the election. The language we have quoted was used *arguendo*. It is at best a reiteration of the other constructions given to this old Pennsylvania statute of 1839. It certainly cannot furnish a basis for the broad doctrine of the text in McCrary. We have gone at length into these cases, because they are the ones upon which the doctrine is bottomed. To my mind they furnish no foundation for a rule so broad and sweeping. To the last case Mr. Brightly adds some three foot notes all of interest, but one in particular. It reads: "A more fallacious argument was never penned; it only shows the judgment of an estimable, honest and learned judge can be warped by his party feeling, in a contested election case; and how unfit a depository of this delicate jurisdiction, is the judicial department, as organized in the United States."

In addition to McCrary and the Ency. of Pl. & Prac. we are cited to two other cases that perhaps should be mentioned. First is the case of Snibley v. Palmtag, 127 Cal. 31. This was a contest over the office of county supervisor in California. We should bear in mind that under the law there as indicated in the 28

Cal. supra, any elector might contest. The court says that the fact that Snibley, who filed the petition, was the person receiving the next highest number of votes did not change the case so far as the question up was concerned. Upon trial *nisi,* it was adjudged that there was a tie vote, and therefore no election, and the certificate of election given to Palmtag was by decree cancelled. From this judgment Palmtag appealed to the Supreme Court. After appeal Snibley died. Palmtag contended the action abated, and moved the Supreme Court to remand the case with directions to the lower court to vacate the judgment and dismiss the action. This the court refused to do and upon the question said:

"The contest is a special statutory proceeding, and it often happens in such cases that the Legislature has failed to anticipate and provide for all possible contingencies. Any elector may inaugurate the contest, and had Snibley not been the opposing candidate the same difficulty would have existed. And the trouble would have been the same if the court had found that Snibley had received a majority of the legal votes, or if the finding had been in favor of the contestee, and he had died after judgment. In either case it seems very hard if the survivor, against whom the judgment has been rendered, cannot appeal from it.

"Where the cause of action one which would die with the person, still after judgment the action does not abate. It is then property, and goes to the estate of the successful party if he dies after judgment. The judgment may be attacked and set aside on appeal, but so long as it stands it is not affected by the death of either party. [Atlantic Dock Co. v. Mayor, 53 N. Y. 64; Shafer v. Shafer, 30 Mich. 163; Danforth v. Danforth, 111 Ill. 236.]

"It is not correct to say that the estate of the deceased has no interest in the controversy. It is provided in section 1125 that if the proceeding be dis-

missed for want of prosecution, or if the election be affirmed, 'judgment must be rendered against the party contesting such election for cost.' Having commenced the proceeding and prosecuted it to judgment, by which the contestee is deprived of an office to which he had been declared elected, neither he nor his estate could escape the responsibility he has assumed. Appellant has a right to his appeal, and there is a chance that the judgment may be reversed, and that upon a retrial the election will be affirmed.

"The motion of the appellant is denied, but upon causing the representative of the estate of Snibley to be substituted the case will be heard."

The next is Taylor v. Beckham, 108 Ky. l. c. 291. This case is a consolidation of three cases. Two of the actions were by injunction against Beckham and others to restrain them from acting in an official capacity, and one was by Beckham himself asking that Taylor et al. be adjudged usurpers. The only thing at all applicable to this case is where the court uses this language: "As to the death of Goebel. The death of Goebel on February 3, did not affect the right of the appellee Beckham. If Goebel was elected Governor and Beckham, Lieutenant-Governor in November, Beckham, upon Goebel's death on February 3, became entitled to the office of Governor, and had the right to continue the contest to secure what the Constitution guaranteed to him."

These cases do not meet the situation here. The California case rests upon the doctrine that, although a cause of action would abate before judgment, yet when such cause of action has been merged into a judgment it does not abate. That is familiar doctrine in Missouri, but is not the cause before us. The Kentucky case rests on the doctrine that Bckham had a personal interest in the contest, in that he had fallen heir by the law to the office.

It is clear to our mind that under the Missouri statutes this is a case which should be abated, and we hereby order and direct that this proceeding now abate. As a matter of law there is an actual cessation of the case, because there can be no substitution for the deceased contestant.  To be fair to the contestee we suggest, however, that the merits of this controversy are covered by the two companion cases of Timmonds v. Kennish, and Gass v. Evans, decided at this term.

All concur except *Kennish* and *Brown, JJ.,* not sitting.